Fannie Maltz, dependent of Harry Maltz, v. Jackoway-Katz Cap Company and Superior Hat Company, Employers, and American Employers' Liability Insurance Company and Consolidated Underwriters, Insurers, Appellants.—82 S. W. (2d) 909.

Division One, April 17, 1935.

*Jones, Hocker, Sullivan, Gladney & Reeder* and *Warren F. Drescher, Jr.,* for Jackoway-Katz Cap Company and American Employers' Liability Insurance Company.

*Fordyce, White, Mayne & Williams* and *G. C. Stribling* for Superior Hat Company and Consolidated Underwriters.

*Fisher & Aronoff* and *Robert L. Aronson* for respondents.

1004

HAYS, J.—Appeal by employers and their insurers from a judgment of the Circuit Court of the City of St. Louis reversing an order of the Workmen's Compensation Commission denying compensation to the dependents of Harry Maltz, deceased.

By the claim filed and amended the dependent widow and minor children of the deceased sought compensation in the sum of $10,660 on account of his death by accident while plying his vocation of traveling salesman.

On this appeal the respondent takes the position, first, that the deceased was an "employee" within the meaning of that term as it is used in the Workmen's Compensation Act, hereinafter referred to as the act; and second, that if so be he was an independent contractor, nevertheless his employment was within the purview of the act and his death compensable thereunder. These propositions may be more conveniently examined in inverse order.

Respecting the second, it is said that the act is a complete and exclusive code, containing definite terms which alone govern all questions of substantive right in cases such as the one at bar; that such terms are to be found in Sections 3308 (a) and 3305 (a) of the Revised Statutes of 1929, and are to be liberally construed pursuant to Section 3374 of the act. Also our attention is directed to the well known practice of this court and our several Courts of Appeals to apply sedulously the rule of liberal construction. Quite naturally and consistently we have no disposition to depart from that rule, wherever it may find proper application in proceedings brought under the act. Illustrative among a number of cases are Wahlig v. Grocer Co., 325 Mo. 677, 29 S. W. (2d) 128; Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601; Teague v. Laclede-Christy Clay Products Co., 331 Mo. 147, 52 S. W. (2d)

880; Russell v. Ely & Walker Dry Goods Co., 332 Mo. 645, 60 S. W. (2d) 44, and Ransdell v. International Shoe Co., 329 Mo. 47, 44 S. W. (2d) 1.

The Wahlig case determines the meaning of the terms "arising out of and in the course of employment" and "where their (employees') services require their presence as a part of such service." The Leilich case and the Teague case held that the language quoted above is without technical meaning and should therefore be given its plain and ordinary meaning, "without reference to some formula." The Russell case also involved a word of plain meaning and without legal significance, namely, "earnings." The Ransdell case construed the word "employment." The cases of the type of these deal with situations in which the workmen were injured "where their services required their presence as a part of their service" and not while they were engaged in or about the premises of their employers, for both of which situations Section 3305 (c) makes provision.

This court has not had previous occasion to interpret the word "employee" as used in said Section 3305 (a), the pertinent part of which reads: "The word 'employee' as used in this chapter shall be construed to mean every person in the service of any employer, as defined in this chapter, under any contract of hire . . . or under any appointment or election." The respondent asserts that this definition has been applied broadly enough to include independent contractors, and in this connection cites, among other cases, Pruitt v. Harker, 328 Mo. 1200, 43 S. W. (2d) 769, wherein this court observed that the word "employee" must be given a broad construction under the act.

In that case the minor son of an independent contractor was injured while working *gratis* for his father in the latter's enterprise. This court held that the minor was an employee of the father by appointment, engaged in carrying on the father's independent work then in progress and, therefore, in the father's service as a workman and entitled to compensation. The status of employee and what constitutes the same was the primary question under consideration. It is apparent that in determining such status *any* one making the appointment and receiving the services necessarily stands in the correlative relation of employer. No interpretation was given, or necessary, of the word "service" used, for that is a term having much the same legal connotations as the term "employee." The son was held to be within the purview of the act because he was a workman of his father in like manner as his adult co-workmen. So the essential terms of the act were not broadened by construction but were harmonized, and the word workman was held to be synonymous with the term "employee" and "service" was marked as the distinguishing feature of each alike.

Pruitt's proceeding, supra, was brought against the owner of the premises on which the work was performed; the work was performed under a contract between such owner and the claimant's father, an independent contractor. The case was ruled upon the liability of such principal or owner under Section 3308 of the act, which makes the owner, jointly with the immediate employer, responsible to the employees of the immediate contractor (independent contractor there), and makes the latter primarily liable as between himself and the owner. And it may appropriately be noted here that said section applies specifically to work performed on the premises and does not contain the clause found in Section 3305 (c), to-wit: "Where their (employees') services require their presence as a part of such services." So that the court's holding decides by necessary implication that the independent contractor himself was not an employee of the principal or owner. It is, therefore, apparent that this case lends no support to respondent's contention made in this connection, since the premises of the employers of the deceased Maltz were situate in the city of St. Louis, while he met with his fatal accident at a distant railroad crossing in the State of Illinois.

Furthermore, the framers of the act had in mind the law of master and servant and the relationship, duties, rights and limitations arising out of the same. The relationship is bottomed upon services (State ex rel. v. Board of Trustees, 192 Mo. App. l. c. 587; Pace v. Appanoose County, 184 Iowa, 498, 168 N. W. 916, 919) to be rendered by the servant—whether by that name, or one synonymous, as workman or employee (Words & Phrases, title Servant and Employee)—to the other, whether as master or employer, and is peculiarly characterized by right of control vested in the latter. [Lawhon v. St. Joseph Veterinary Laboratories, 252 S. W. 44.] The legislative design, proclaimed by the title and emphasized by the provisions of the act, was to ameliorate, in the interest of the workman and the public welfare, the losses sustained by himself and his dependents from accidental injuries received by him in the proper course of his work, irrespective of causal or contributing fault on his part. With such awareness and such purpose the Legislature saw fit to select and specify (Sec. 3308-a) a limited class of persons—independent contractors and their subordinates—as being entitled to the benefits of the act when, as shown above, the work was done on the employer's premises. Such legislative singling out would, under the elementary rule for the interpretation of documents of all sorts, *expressio unius est exclusio alterius*, necessarily operate to exclude from the act independent contractors not coming within the particular class designated, and nowhere mentioned or defined in the act. They are excluded from the benefits of the act also by the plain import of the statutory definition of employee (Section 3305-a), which definition, so far as pertinent, declares that the word "shall

be construed to mean every person *in the service* of any employer,'' etc. And the word service as used signifies, as already pointed out, controllable service. ''It is a familiar rule of construction that where a statute uses words which have a definite and well known meaning at common law it will be presumed that the terms are used in the sense in which they were understood at common law, and they will be so construed unless it clearly appears that it was not so intended.'' [24 R. C. L., p. 994, sec. 236, and Perm. Supp., pp. 1641-1642; State v. Murlin, 137 Mo. 297, 38 S. W. 923.]

Our Courts of Appeals have placed on the act, in its relation to independent contractors, essentially the same construction as ours, supra. [See Simpson v. New Madrid Stave Co., 52 S. W. (2d) 615; Carman v. Central Western Dairies Co., 58 S. W. (2d) 781; Meyer v. Adams, 50 S. W. (2d) 744.]

■ The case now hinges on whether Harry Maltz, the deceased, was an independent contractor, for if he was the commission's denial of an award must be sustained and the judgment of the circuit court reversed. About the nature of the commission's findings and conclusions, and the scope and method of this court's review of the same, the several counsel make much ado; so, of the suggestions made in that regard some notice must needs be taken.

Appellants assert that in this proceeding such findings and conclusion present only a question of fact; that the same are conclusive on this appeal because of being predicated upon conflicting evidence in which there is sufficient competent favorable testimony, together with all reasonable inferences which may be drawn therefrom, to support the conclusion of the commission. Appellants' position in this is supported in its entirety by authorities, on the records involved, such as those cited first in the preceding discussion. But we cannot agree to the proposition that the commission's conclusion was one of fact. The whole of the discussion above, in the distinctions therein drawn, has developed that the term employee is one of legal significance as determined by the application of fixed rules of law and, therefore, presents a question of law, and we actually determined it as such. However, that matter, so far as this appeal is concerned, seems academic rather than substantial in the light of the controlling statute, Section 3342, which provides that the court, on appeal, shall review only questions of law and rule the award on the ground (4), among others, ''That there was not sufficient competent evidence in the record to warrant the making of the award.'' It thus appears that the scope of appellate review, wholly dependent as it is upon the statute, is the same in all appeals taken under the act and is necessarily confined to questions of law, and in the present case to the legal sufficiency of the evidence to warrant the denial of an award. The distinction we have sought to point out may be aptly summarized thus: ''Whether a finding

is an ultimate fact or conclusion of law depends upon whether it is reached by natural reasoning or by the application of fixed rules of law. In other words, where the ultimate conclusion can be arrived at only by applying a rule of law, the result so reached embodies a conclusion of law, and is not a finding of fact.''

It is the well-settled rule of practice that in the consideration of the commission's findings with a view to determining the competency and substantiality of the evidence to support the award, we regard the findings of fact as being of the nature of a special verdict, and if the evidence is conflicting and there is yet substantial competent testimony which, if believed, supports the finding of the commission, the same will be affirmed. Leilich v. Motor Co., supra, and many other cases needless to cite.

We look, then, first to the findings of fact, comprising as they do the ultimate facts, and next to the underlying evidence in order to discover conflicts, if any, in the testimony and to determine the legal sufficiency of the evidence to support the findings and the denial of an award. There are, however, some admissions of record made preceding the hearing which are to be noted along with the commission's finding.

It was conceded that if Harry Maltz, the deceased, was an employee of said employers within the meaning of that term as found in the compensation law, he was killed by an accident arising out of and in the course of his employment. It was admitted of record that the Jackoway-Katz Cap Company and the Superior Hat Company were major employers; that the liability of the first mentioned was fully covered by appellant American Employers' Liability Insurance Company and that the liability of appellant hat company was fully covered by appellant Consolidated Underwriters.

This is the commission's finding and conclusion: "We find from the evidence that the deceased was an independent jobber and was not an employee of the above named employers as provided in the compensation law. His duties were independent of the employers with no supervision over his method of obtaining sales and the above employers were only interested in the results to be obtained. Therefore, since the relationship of employer and employee did not exist on August 19, 1931, compensation must be denied.''

The record shows that Harry Maltz had for some ten years before his death on said date been engaged mostly, though not continuously, as a salesman in selling hats and caps to retail dealers; for a year in that period, about 1929 or 1930, in selling for a cap firm in which he was a co-partner and at the same time selling hats for another concern; and as a result of such experience in his occupation he had acquired customers among retailers of hats and caps— not an unusual accomplishment for traveling salesmen after long experience in that occupation. About the middle of April, 1931, no

longer having a business of his own, and being without employment, he applied to appellant hat company to take its line of hats and sell same to the retail trade, on commission and in conjunction with the hat company's line of hats. They came to an oral agreement whereby he was engaged to sell said company's hats on 10 per cent commission, 75 per cent of which was drawable on acceptance by the company of the orders obtained by him in "St. Louis and vicinity."

The hat company's salesmanager, who made the arrangement on the company's behalf, and alone testified concerning the transaction, said he told Maltz that the only way he could have the line was practically the same as all the company's other salesmen had it. There were some fifty of these and none was on a direct salary but all were working on commission, and only a dozen with a drawing account. The arrangements with those without drawing accounts were the same as that made with Maltz as to amount of commission. Nearly all the salesmen used their own automobiles, paying all expenses of use and upkeep as well as all other traveling and personal expenses. None provided his employer with any route list except in the giving of his name and address. The witness said there was a difference between Maltz and the other salesmen with drawing accounts in that the territories of the latter were outlined exclusively and that also the latter were absolutely at the beck and call of the salesmanager. He was unable to state exactly what territory he assigned to Maltz but it was "St. Louis and vicinity so long as he did not encroach upon the territory of another salesman of the company;" that Maltz worked in that territory and nobody else did, although there "might have been" an occasional order taken there by somebody else; that he was supplied with a line of samples, an order book (and, as elsewhere shown by the record, blank "daily-report sheets"); that under the agreement Maltz was to take the line out and sell as many orders as he could. He was not ordered to report at any particular intervals, the time, number and methods of sales were not dictated by the employer, but, as the witness said, those matters were largely dependent upon the ability and judgment of the salesman and involved a large amount of discretion; but the company frequently stressed the number of days salesmen would work, wanted them to work as much as possible, but so long as the company believed the salesman was working reasonably sufficiently the company made no effort to dictate his days or hours of work, and on the whole a salesman was permitted to use his own judgment in that matter. By weekly withdrawals Maltz's account was overdrawn $115.26 at the time of his death.

It appears that when Maltz sold an order which was accepted by the company the goods were billed to the merchant who gave the order and were charged to the account of the merchant, to whom and not to Maltz the company looked for payment and

from whom it received payment; Maltz having no authority to collect. Upon the acceptance of an order as stated, Maltz became entitled to draw on his account for as much as seventy-five per cent of his commission thereon. At the end of the year deductions were to be made from the remaining twenty-five per cent of commissions to cover cancellations, declined merchandise and other such losses.

The order blanks so furnished contained spaces for the customers' names and addresses and the signature of the "salesman." The order books in evidence contained numerous duplicate, or carbon, sheets, some of which had been filled out by Maltz as orders and contained the name of H. Maltz as "salesman."

A number of the "daily-report sheets" mentioned above were sent in to the hat company by Maltz. At the top of these was the printed matter: "Please fill out and mail this daily report every night. It is necessary for us to know the names of the customers upon whom you call. Please notice the firm name before you enter the store and write it down. In column 5 insert numbers to indicate why you could not sell. '1 means too early. 2 means stock on hand. 3 means do not handle. 4 means buyer was out. 5 means too busy. 6 means already bought (if already bought, insert name of company from whom he bought in column 6).' " The blanks had appropriate spaces for names of firms called on, the buyer, the town, the amount sold, "delivery date" and "remarks."

In July, 1931, Maltz made a similar oral agreement with appellant cap company for the selling of the latter's line of caps and received from this company similar equipment to that received from the hat company, except as to daily-report sheets. The two lines of merchandise were complementary rather than competitive.

The making of this agreement with the cap company, and the terms of it, depend solely upon Mr. Sam Jackoway's testimony and the surroundings. His testimony was to this effect: Maltz worked for the Superior Hat Company as already shown and, looking for another "line," he applied to the witness who was the owner and president of the Jackoway-Katz Cap Company. Jackoway hired Maltz who took the cap company's line in conjunction with the other and was, as Jackoway testified, "supposed to sell in the city of St. Louis and surrounding towns; in other words, St. Louis and vicinity would include St. Louis County and Southern Illinois. He and I both worked the city of St. Louis. We gave him our line of caps together with an order book on which he was supposed to get orders; he was to receive 10 per cent commission on goods sold. . . . I would talk with him when he came in to see what accounts he had lined up, but I made no suggestions as to what he should do or how he should handle his line, because he had his own

customers and was working them; by that I mean merchants that he knew; they were anybody's customers; just the trade.'' He chose his own route and schedule without restriction, and days and hours of work. As to all those matters, the witness said: ''We have no control over salesmen. Salesmen are compelled by the nature of their work to use their own judgment about it. . . . If he got an order and we shipped it we entered the merchant on our books as a customer and expected Maltz to go out and get more orders from him; he got a number of orders for us and sent them in on the order book. Some were accepted and shipped and others were turned down. . . . I don't say he was not our salesman. I explained it to you, when he wanted to start working he came up and he said, 'Sam, I have got the Superior line, and I need another line to make a living.' Both lines he works together. I don't know what you call it. He was one of our salesmen on a 10 per cent commission basis and a part of our sales organization, and we regarded him as such. I haven't any other salesmen besides my brother, Maltz and myself.'' At the time of his death Maltz's account with the cap company, from weekly withdrawals, was overdrawn $98.76.

In a deposition given by Jackoway he said that when Maltz and the witness had conferences they naturally talked about their business, and they talked about the fact that Maltz was lining up some trade for the business; that it was hard to remember the substance of the conversations, but that Maltz would come into the house and want to get a little money and would report on this and that, and the next week he might get an order; that was all; that when Maltz would bring in an order Maltz would explain about it; sometimes there was some delay in connection with an order; that an account was kept for Maltz and his drawings were charged against his sales.

The record is replete with efforts made by the counsel, by the one side to press the witness into giving an interpretation of the agreements against themselves, the employers, and by the other side, contrawise, and to withhold in some instances and overstrain in others, in the interest of the employers. But all such has been omitted from the recital above because it involved matters of opinion, conjecture, or conclusion, and is therefore incompetent.

In the evidence so fully stated above there are, manifestly, no conflicts. In the nature of the case there could not well be, for in its essentials the testimony all came from the mouths of the employers themselves. In this state of the record the applicable rule of procedure is that where the evidence is undisputed, or agreed, and is reasonably susceptible of but a single inference of what relationship is shown to exist between an employer and an alleged employee, the question for determination is one of law, irrespective,

as shown herein above, of whether it was of law or of fact as presented to the commission below. [Russell v. Ely & Walker Dry Goods Co., 60 S. W. (2d) 44; Sawtell v. Stern Bros. Co. (Mo. App.), 44 S. W. (2d) 264; Baker v. Milling Co., 323 Mo. 1089, 20 S. W. (2d) 494; 28 R. C. L., sec. 57, p. 763, at bottom.] The relationship was that of independent contractor or of employee—the one or the other,—as dependent upon the facts; and on the record here either is exclusive of the other, and the conclusion to be drawn is one of law.

The rule in relation to independent contractor has been expressed in a variety of forms, all the same in substance, and oftentimes thus: "An independent contractor is one, who, exercising an independent employment, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer except as to the result of his work." [Flori v. Dolph (Mo.), 192 S. W. 949, 950; 14 R. C. L., p. 67, sec. 2.] This and other definitions of such status serve rather as a general outline of the field of inquiry, as is recognized in the universal expression to the effect that each case must depend upon its own surroundings, facts and circumstances, and be subjected to established specific tests in aid of the ultimate and decisive test, right of control.

The commonly recognized tests of such relationship are: The existence of a contract for the performance by a person of a certain piece of work at a fixed price; independent nature of his business or occupation; his employment of assistants with the right to supervise their work; his obligation to furnish necessary tools, supplies and materials; his right to control the progress of the work, except as to final results; the time for which he is employed; the method of payment, whether by time or by the job; and perhaps others.

Argument is made by appellants that this relationship is supported by the facts that Maltz had connections with two companies and perhaps with others; that he had theretofore established and was then pursuing an independent business or calling of his own; that the method of payment was indicative; that he was assigned no definite and exclusive territory; and that he controlled the details of his work. They rely principally upon Coul v. George B. Peck Dry Goods Co., 326 Mo. 870, 32 S. W. (2d) 758; Jones v. Century Coal Co., 46 S. W. (2d) 196; Meyer v. Adams, 50 S. W. (2d) 744; Woodruff v. Superior Mining Co., 70 S. W. (2d) 1105; Carman v. Central Western Dairies Co., 58 S. W. (2d) 781; Badger Furniture Co. v. Ind. Comm., 200 Wis. 127, 227 N. W. 288; Hy. Haertel Service, Inc., v. Ind. Comm. (Wis.), 248 N. W. 430, and other cases too numerous to set out.

We shall not undertake to analyze the cited cases. Each contains one or more features in common with the case at bar, but not one, as we view them, contains a similar combination of features. The

one chiefly relied on by, the cap company, and having analogy perhaps as close as any of the others, is Badger v. Ind. Comm., supra, which holds that the facts reviewed showed that the claimant's decedent was an independent contractor. There the salesman provided his own car, paying his own expenses; was at liberty to take on several other lines of goods and did so. It was clear, the court said, that the relation of employer and employee was not intended. His work was at a distance from his employer's location, and his territory extensive. The employer could exercise but little supervision or control and he could cover the territory as he chose. On such facts the court held that the employer's aid rendered him in promoting sales was rendered merely in co-operation.

Though Maltz was permitted to carry and did carry two lines of goods—but only two,—they were complementary one with the other, and the duality of his employment did not affect his status. [Taylor v. St. Paul's Universalist Church (Conn.), 145 Atl. 887; Sargent v. Knowlson Co., 224 Mich. 686, 195 N. W. 810; Sec. 3307, R. S. 1929.]

With regard to the method of compensation, it is ordinarily correct to say that if the work is done by the job or piece this is indicative of the relationship of independent contractor, and the same may be said of the lack of obligation to observe definite hours in reporting for work or in performing the same. [Coul v. Dry Goods Co., supra, l. c. 874.] On the other hand, the want of the power of substitution is indicative of personal or non-delegable service, which is a feature of the relationship of master and servant (*Ibid.*) and likewise of that of employer and employee. It is obvious that Maltz's duties were personal by reason of the very nature of the work, which was continuous and for which his compensation, though estimated upon orders accepted by his employers, was not to be all paid by the piece or job, but was paid through checks drawn weekly on his commission accounts, averaging approximately $35 a week from the hat company and approximately $30 a week from the cap company. This arrangement was not inconsistent with the relationship of employer and employee; nor did this method of payment create a distinct relation in law. [Easton v. Ind. Acc. Comm. (Cal.), 167 Pac. 288-291; Thurman v. Fleming-Young Coal Co. (Mo. App.), 49 S. W. (2d) 288, 292.]

His was not an established business in the sense the appellants contend it was. The proposed circumstances that in bygone years he had been a traveling salesman, and later a merchant or proprietor for a time during which he sold his own wares, lends no countenance to a claim of a later independent business. His customers had, as Jackoway expressed it, become anybody's customers. With reference to the car and other equipment, he supplied the car, while the employers supplied the remainder. This did not affect his status. [Wahlig v. Grocer Co., supra.]

Argument is made that no definite or exclusive territory was assigned to the deceased. This proposal is evidently made in an effort to show a dissimilarity between his situation and that of other salesmen of the employers. We think the evidence in that regard, so far as competent, shows no substantial difference. As to the description of the territory, we think it was sufficiently definite and restrictive under the maxim *id certum est reddi certum potest*. Besides, that matter appears to have worked out without misunderstanding or encroachment. Nor can any substantial distinction be drawn between Maltz and the other salesmen with respect to their relations to the employers.

Question is raised with respect to the significance of the employers' insurance against liability. Appellants' admission in that regard made of record, was that the cap company's liability was fully covered by appellant American Liability Insurance Company, and the hat company's liability by appellant Consolidated Underwriters. This admission was made at the beginning of the hearing of this proceeding before a referee of the commission. Relative to insurance the record contains this: the hat company's manager gave evidence that Maltz's name was not on any payroll but that he drew money according to the business he obtained and without right to advances in definite sums.

What force and effect should be attributed to this admission? In the modern view it is not a true admission, which, in the correct sense, is a formal act, done in the course of judicial proceedings, which waives or dispenses with the production of evidence, by conceding for the purposes of litigation that the proposition of fact alleged by the opponent is true. A quasi-admission, as distinguished from the former, is nothing but an item of evidence and, therefore, not in any sense final or conclusive. The opponent whose utterance it is, may none the less proceed with his proof in denial of its correctness; it is merely an inconsistency which discredits, in greater or less degree, his present claim and his other evidence. When such proof in denial is introduced, estoppel does not arise and the weight of the admission and the proof in denial of the admission, are to be weighed and determined by the triers of fact if the denial is substantial. [2 Wigmore on Evidence (2 Ed.) 518-519.]

We are unable to say that the evidence given in the present case in denial of insurance was unsubstantial. And since we are only determining the legal significance of undisputed facts, we pass the question of insurance without further comment.

It now remains but to consider the final and determinant test—the lodgment of the right of control of the details of the work,—in the light of the considerations above and others that may suggest themselves. The evidence viewed as a whole and in the light of the situations of the parties with respect to the agreements they were

making, it appears therefrom that Maltz was without any business or employment and was seeking a means of livelihood. The engagement he sought was the doing of work necessary in the operation of the business of these employers and usually performed by employees. It was within the contemplation of the parties that he make the usual effort of a salesman in the doing, in the usual way, of the usual things calculated to accomplish results in advancing the business of his employers and in replenishing his own larder. Of a certainty there was on the part of the employers no express relinquishment of their right, if any, to control the details of the work. The work cut out for him was the mere soliciting of orders by making calls on retail dealers, and, in that behalf, he necessarily enlisted his own personality, personal experience, personal discretion and judgment. He was skilled in salesmanship and personally acquainted with the "trade" whom he was expected to solicit. It appears there was little, if any, more that the employers might have done than they actually did in controlling the details. From the printed matter appearing on the report sheets which were furnished Maltz it is manifest that the request made of him to send in the detailed information referred to therein was tantamount to an assertion of the right of control. It is true he did not make reports continuously. Yet he did make reports repeatedly and to the satisfaction of the employer, and this was a recognition on his part of the right of control so asserted.

After all, the essential question is not what the companies did when the work was being done but whether they had a right to assert or exercise control. [19 A. L. R. Ann. 240, and Vol. 75 of same, 725.] Acts of control, or the contrary, do, however, have a tendency to show the retention or the relinquishment of the right, the inference depending upon the apparent necessity or want of necessity for the exercise of the control. Less control was exercised by the cap company than by the other employer, yet we think it was sufficient. The evidence supports the reasonable inference that Maltz on his visits to headquarters made oral reports to Mr. Jackoway and received oral instructions from the latter. Considering the relative positions of the two men, Jackoway was in apparent authority and whatever directions or advice he gave were on that account of much the same effect as commands might have been. This conclusion is supported by the fact that Maltz was engaged for no definite period of time, and, therefore, was subject to dismissal at the will of his employers. "No single fact is more conclusive as to the effect of the contract of employment, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of the work itself." [Cockran v. Rice, 26 S. D. 393, 128 N. W. 583.]

It is our conclusion that there was no substantial competent evi-

1016

dence to support the findings and conclusion of the Workmen's Compensation Commission that said Maltz, deceased, was an independent contractor and his dependents not entitled to an award. Accordingly, the judgment of the circuit court is affirmed. All concur.