Frank A. SLOAN, Appellant,

v.

BANKERS LIFE & CASUALTY COMPANY, and Norman Fischer, Respondents.

No. WD 55679.

Missouri Court of Appeals, Western District.

Submitted April 20, 1999.

Decided July 20, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1999.

Application for Transfer Denied Oct. 26, 1999.

William A. Lynch, Kansas City, for Appellant.

Richard D. Schreiber, St. Louis, for Respondent.

Before ULRICH, P.J., SPINDEN and SMART, JJ.

SMART, Judge.

Frank Sloan, an insurance agent for Bankers Life & Casualty Company ("Bankers Life"), filed suit against Bankers Life and Norman Fischer, the branch manager of Bankers Life's Jefferson City, Missouri office, alleging age discrimination

and retaliation in violation of the Missouri Human Rights Act ("MHRA"); tortious interference with a business expectancy; and breach of the duty of good faith and fair dealing owed to Mr. Sloan under his agent contract with Bankers Life. The trial court dismissed Mr. Sloan's claims under the MHRA for lack of subject matter jurisdiction. Mr. Sloan's claims of tortious interference with a business expectancy and breach of good faith and fair dealing resulted in a jury verdict in favor of Mr. Sloan. The jury awarded Mr. Sloan $400,-000.00 in compensatory damages for tortious interference with a business expectancy and breach of good faith and fair dealing against Bankers Life and Mr. Fischer, and $500,000.00 in punitive damages for tortious interference with a business expectancy against Bankers Life only. The trial court granted Bankers Life's and Mr. Fischer's motions for JNOV on the claim related to tortious interference with a business expectancy. The trial court granted a new trial on the breach of good faith and fair dealing claim. Mr. Sloan appeals the dismissal of his claims under the MHRA, the grant of JNOV on his tortious interference with a business expectancy claim, and the grant of a new trial on his breach of good faith and fair dealing claim.

We affirm the trial court in each respect, except that we reverse the grant of new trial as to the liability issues on the breach of good faith claim and remand only for a trial on the issue of damages.

### Factual Background

Frank Sloan began selling health and life insurance for Bankers Life in 1953. Mr. Sloan worked strictly on a commission basis. He set his own hours and paid his own licensing and other expenses. Mr. Sloan maintained his own office outside of Bankers Life's Jefferson City, Missouri office at his own expense.

After the passage of the Medicare Act in 1966, Bankers Life began selling Medicare supplement insurance. Since the 1970s, Medicare supplement insurance has been Bankers Life's highest-selling policy. The purpose of the Medicare supplement insurance policy is to provide payment for the expenses not covered by Medicare. Mr. Sloan learned that the best time to sell Medicare supplement insurance to an individual is just before that individual turns sixty-five.

In 1984, Mr. Sloan learned about "turning 65 lists." These lists, which identified individuals who were close to turning sixty-five, were available for purchase from independent sources. Mr. Sloan began purchasing these lists at his own expense in 1984. The lists provided him "with a mechanism to precisely identity individuals turning 65 within his region." These lists provided Mr. Sloan with the names of between 150 and 200 prospects for Medicare supplement insurance every month.

In 1991, Norman Fischer became the branch sales manager of Bankers Life's Jefferson City office. Mr. Fischer knew that Mr. Sloan was purchasing the "turning 65 lists" and that a significant portion of Mr. Sloan's income resulted from the use of these lists. Mr. Fischer did not object to Mr. Sloan's purchase and use of the "turning 65 lists." Bankers Life, however, began purchasing its own lists of individuals turning sixty-five. Mr. Fischer sometimes distributed these lists to sales agents within the branch, but did not distribute lists to Mr. Sloan.

In 1994, Mr. Sloan was the top agent in the Jefferson City branch, receiving several sales awards. In February 1995, Mr. Fischer met with Mr. Sloan to discuss goals for 1995. Mr. Fischer requested that Mr. Sloan attempt to sell other policies in addition to Medicare supplement insurance. Although Bankers Life had a policy of "protecting" households from other agents, Mr. Fischer also warned Mr. Sloan that he might have other agents contact Mr. Sloan's existing policyholders concerning other Bankers Life products. Shortly after the February meeting, Mr.

Sloan went through his 1994 records and provided Mr. Fischer with information showing that Mr. Sloan had good policyholder relation skills. Mr. Sloan also showed Mr. Fischer that of the $114,000.00 in premiums that Mr. Sloan had sold in 1994, $44,000.00 was from existing policyholders. Mr. Fischer responded that this information was "very encouraging."

Bankers Life held a management meeting in Kansas City, Missouri, in March 1995. Present at that meeting were: Mr. Fischer; his supervisor Michael Lees, the Regional Sales Vice–President; and Randy Eppenauer, an agent development associate. At the management meeting, Bankers Life changed its "turning 65 list" policy. Bankers Life decided that it would no longer allow agents to use their own lists, and decided that it would divide the company's "turning 65 list" among all of its agents in the Jefferson City area. The agents would be able to sell Medicare supplement insurance only to people in an assigned territory. Mr. Fischer testified that the motivation for the change in Bankers Life's policy came from dissatisfaction with the fact that people turning 65 were being contacted by multiple agents. During the meeting, it was decided that Mr. Sloan and Bill Jenkins, another veteran agent, would be the first agents notified of the rule change because they sold more Medicare supplement insurance policies than any other agents. At the conclusion of the meeting, Mr. Lees drafted a memorandum for Mr. Fischer to distribute to the Jefferson City agents regarding the new restrictions imposed on the use of the "turning 65 lists."

After returning from the management meeting, Mr. Fischer notified Mr. Sloan that Mr. Fischer and Mr. Lees wished to meet with him. Mr. Fischer would not explain the purpose of the meeting. Fearing the worst, Mr. Sloan prepared a letter of resignation. During their meeting, Mr. Fischer informed Mr. Sloan that the newer agents found that when they called on prospective Medicare supplement insur-ance customers, Mr. Sloan had already been there. Mr. Lees and Mr. Fischer informed Mr. Sloan that he would no longer be allowed to use his personal "turning 65 list," but instead, he would be limited to selling Medicare supplement insurance in a certain territory in the Jefferson City area, designated by zip code.

Mr. Sloan, upset by this development, tendered his letter of resignation. Mr. Fischer and Mr. Lees asked him to reconsider. On the Monday morning following their meeting, Mr. Sloan told Mr. Fischer that he had decided to remain at Bankers Life and would abide by the new rules. Mr. Sloan informed Mr. Fischer that, in spite of his decision to stay, he believed he had been discriminated against because of his age (sixty-seven) and was going to pursue a legal remedy. Mr. Sloan gave Mr. Fischer a letter asking him to reconsider implementing the policy changes, which Fischer refused to do. At a meeting on March 31, 1995, Mr. Lees told Mr. Sloan, "We have read your letter; and . . . our decision, Bankers Life's decision, is to back Norm Fischer on this." Mr. Sloan told Mr. Fischer that he hoped they would continue to have a cordial working relationship. Mr. Fischer replied that it would be difficult to have a cordial relationship if Mr. Sloan sued Bankers Life.

As a result of the policy changes, Mr. Sloan's Medicare supplement insurance prospects amounted to approximately ten or eleven prospects per month. Mr. Sloan asserted he had formerly been able to pursue approximately 200 prospects per month. In an attempt to demonstrate the negative impact on his livelihood, Mr. Sloan showed Mr. Fischer one of his paychecks, showing that Mr. Sloan had earned $12.88 in a two-week period.

Mr. Fischer retired from Bankers Life in early 1997. Shortly after Mr. Fischer's retirement, twenty-six year old Glenn Wilde became branch manager of the Jefferson City office. Mr. Wilde met with Mr. Sloan, Mr. Jenkins, and another veteran agent and told them that it appeared

that Bankers Life sold more policies using the original method of prospecting Medicare supplement insurance. After asking the men their thoughts on returning to the old way of prospecting Medicare supplement insurance, Mr. Wilde contacted Mr. Lees and asked whether the Jefferson City office could return to the old system of prospecting. After speaking with Mr. Lees, Mr. Wilde understood that he could make his own decision regarding the Medicare supplement insurance prospecting rules. However, Mr. Wilde lied to Mr. Sloan, telling him that, according to Mr. Lees, they could not return to the old system of prospecting.

## Procedural History

Mr. Sloan's original petition against Bankers Life was filed on March 21, 1996. In Count I, Mr. Sloan alleged that Bankers Life and Mr. Fischer had subjected him to age discrimination in violation of the Missouri Human Rights Act ("MHRA"). Count II alleged that Mr. Sloan was subjected to retaliation for exercising his rights, pursuant to the MHRA. Count III alleged tortious interference with Mr. Sloan's business relations, and Count IV alleged that the defendants breached the duty of good faith and fair dealing, which they owed to Mr. Sloan by virtue of their agency contract.

The defendants filed a motion to dismiss for improper venue under Missouri's general venue statute, § 508.010(2), RSMo 1994,[1] claiming that. venue in Jackson County was improper because Mr. Fischer did not reside in Jackson County, and Bankers Life did not have a registered agent in Jackson County. The trial court denied this motion on June 4, 1996.

On November 18, 1997, the defendants filed a motion to dismiss Mr. Sloan's age discrimination and retaliation claims under § 213.111.1 of the MHRA, claiming that the court lacked subject matter jurisdiction because Mr. Sloan had not alleged that any unlawful discriminatory practices took place in Jackson County, Missouri. The court granted this motion on December 1, 1997, and dismissed Counts I and II of Mr. Sloan's petition.

On December 8, 1997, the jury returned a verdict in favor of Mr. Sloan on his claims of tortious interference and breach of good faith and fair dealing. The jury awarded Mr. Sloan $400,000.00 in compensatory damages against Bankers Life and Norman Fischer. The jury also awarded Mr. Sloan $500,000.00 in punitive damages against Bankers Life on his tortious interference with business expectancy claim. Upon defendants' post-trial motions, the court granted a JNOV as to the tortious interference claim, ruling that Mr. Sloan did not have a business expectancy. The trial court granted defendants' motion for new trial as to the claim of breach of good faith and fair dealing, concluding that the jury should have been given separate "packaged" damage instructions as to the tortious interference claim and the breach of good faith and fair dealing claim.

Mr. Sloan appeals, raising five points. We address them out of the order in which they are raised.

## Dismissal of the MHRA Claims[2]

In Point III, Mr. Sloan claims that the trial court erred, as a matter of law, in dismissing his claims under the MHRA for lack of subject matter jurisdiction. Mr. Sloan contends that § 213.111,[3] the section

---

1. All statutory references are to the Revised Statutes of Missouri, 1994, unless otherwise indicated.

2. Mr. Sloan filed two claims under the MHRA: (1) that Bankers Life and Mr. Fischer discriminated against Mr. Sloan based on his age; and (2) that Bankers Life and Mr. Fisch-

er subjected Mr. Sloan to retaliation for exercising his rights pursuant to the MHRA.

3. Section 213.111 provides that an action brought under the MHRA "may be brought in any circuit court in any county in which the unlawful discriminatory practice is alleged to have occurred, either before a circuit or associate circuit judge." § 213.111.1, RSMo 1994.

under which the trial court dismissed his action, addresses venue rather than jurisdiction. Mr. Sloan argues that under Rule 55.27(g)(1), because Bankers Life challenged venue under § 508.010 on April 18, 1996, it waived any subsequent challenges to venue.

▮ Statutory construction is a matter of law, not a matter of discretion. *State ex rel. Igoe v. Bradford,* 611 S.W.2d 343, 350 (Mo.App.1980). As such, our review of the trial court's dismissal is *de novo,* and no deference is given to the trial court's determination. *Barry Serv. Agency Co. v. Manning,* 891 S.W.2d 882, 887 (Mo.App.1995).

### Employees and Independent Contractors Under the MHRA

In 1961, the General Assembly enacted the MHRA, which addresses discriminatory practices in employment matters.[4] Under the MHRA:

1. It shall be an unlawful employment practice:

(1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or handicap of any individual:

(a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or handicap;

§ 213.055, RSMo 1994. Further, the MHRA provides that:

It shall be an unlawful discriminatory practice:

(1) To aid, abet, incite, compel, or coerce the commission of acts prohibited under this chapter or to attempt to do so;

(2) To retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to this chapter.

§ 213.070, RSMo 1994. Under the MHRA, an "employer" is defined as "... any person employing six or more persons within the state, and any person directly acting in the interest of an employer...." § 213.010(6), RSMo 1994.

In interpreting provisions of the MHRA, Missouri courts have often turned to federal case law as well as case law from other states interpreting analogous discrimination statutes. *Midstate Oil Co., Inc. v. Missouri Comm'n on Human Rights,* 679 S.W.2d 842, 845–46 (Mo. banc 1984); *Laclede Cab v. Missouri Comm'n on Human Rights,* 748 S.W.2d 390, 393–94 (Mo.App. 1988). Neither Title VII, the Americans with Disabilities Act ("ADA") nor the Age Discrimination in Employment Act ("ADEA"), all of which use similar definitions of "employer",[5] have been held to protect independent contractors. *See, e.g., EEOC v. North Knox Sch. Corp.,* 154 F.3d

4. For a general discussion of the history of the MHRA, *see* John F. Medler, Jr., *The Right to Jury Trial Under the Missouri Human Rights Act,* 50 J. Mo. BAR 31 (Jan.-Feb., 1994).

5. Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...." 42 U.S.C. § 2000e(b). The ADA defines an "employer" as "a person engaged

in an industry affecting commerce who has 15 or more employees for each working day in each of 2 or more calendar weeks in the current or preceding calendar year, and any agent of such person[.]" 42 U.S.C. § 12111(5)(a). The ADEA defines an "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each day in each of twenty or more calendar weeks in the current or preceding calendar year ... and any agent of such a person[.]" 29 U.S.C. § 630(b).

744, 746 (7th Cir.1998) (ADEA does not protect independent contractors); *Birchem v. Knights of Columbus,* 116 F.3d 310, 312 (8th Cir.1997) (ADA does not protect independent contractors); *Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377, 378–79 (7th Cir.1991) (Title VII does not protect independent contractors).

■ Although the term "employee" is not expressly defined by the MHRA, we believe that a definition similar to those used in the analogous federal statutes may be implied. Title VII, the ADA and the ADEA all define "employee" as an individual employed by an employer...." *See* 42 U.S.C. § 2000e(f); 42 U.S.C. § 12111(4); and 29 U.S.C. § 630(f). Additionally, the MHRA prohibits an employer from "fail[ing] or refus[ing] to hire or ... discharg[ing] any individual...." Because only employees can be hired and discharged, we may assume that the MHRA applies only to employer-employee relationships. *See North Knox Sch. Corp.,* 154 F.3d at 746. Therefore, we must determine whether Mr. Sloan had an employer-employee or an agent-independent contractor relationship with Bankers Life.

■ Employees and independent contractors are distinguished primarily on the basis of the amount of control the alleged employer has over them. *Cole v. Town & Country Exteriors,* 837 S.W.2d 580, 584 (Mo.App.1992). This is determined by considering such factors as: (1) whether the work is part of the employer's regular business; (2) whether the employment requires special skills; (3) whether the person is able to hire assistants; (4) whether the person's work is done with or without supervision; (5) whether the person must furnish his or her own supplies, equipment and materials; (6) whether a contract for a specific piece of work at a fixed price exists; (7) how long the person is employed; (8) how the person is compensated; and (9) the extent to which the person may *control* the details of his or her work. *Maltz v. Jackoway–Katz Cap Co.,* 336 Mo. 1000, 82 S.W.2d 909, 916 (Mo.1934).

The distinction between an employee and an independent contractor also arises with some regularity in the context of unemployment compensation cases. Section 288.034.5 provides:

> Service performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that such services were performed by an independent contractor. In determining the existence of the independent contractor relationship, the common law of agency right to control shall be applied. The common law of agency right to control test shall include but not be limited to: if the alleged employer retains the right to control the manner and means by which the results are to be accomplished, the individual who performs the service is an employee. If only the results are controlled, the individual performing the service is an independent contractor.

§ 288.034.5, RSMo 1994. In interpreting § 288.034.5, the Division applies the common law rules used in determining the nature of the employer–employer relationship under § 3606 of the Internal Revenue Code. *Division of Employment Sec. v. Hatfield,* 831 S.W.2d 216, 218 (Mo.App. 1992) (citing 8 C.S.R. 10–4.150). Section 3121 of Chapter 26 of the United States Code adopts the definition of an employee as "any individual who, under the usual common law rules applicable in determining the employer–employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2). Under federal common law, there are twelve factors to be considered when determining whether a worker is an employee or an independent contractor:

> [T]he skill required; the source of the instrumentalities and tools; the location of the work; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of

the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989). Further, the Internal Revenue Service has identified twenty separate factors to be considered, codified in Internal Revenue Service Ruling 87–41.[6] In determining whether a worker is an employee or an independent contractor, Missouri courts have turned to both the *Reid* factors and those found in Revenue Ruling 87–41. *See, e.g., Travelers Equities Sales, Inc. v. Division of Employment Sec.,* 927 S.W.2d 912, 921–25 (Mo.App.1996); *Edward Lowe Indus., Inc. v. Division of Employment Sec.,* 865 S.W.2d 855, 860–62 (Mo.App.1993); *Veterans Servs., Inc. v. Labor & Indus. Relations Comm'n,* 861 S.W.2d 781, 786–90 (Mo.App.1993).

With all of these factors in mind, we now turn to the present case. One item to consider is Mr. Sloan's contract with Bankers Life, which stated:

### 4. INDEPENDENT CONTRACTOR

This contract shall not create an employer-employee relationship. The relationship of Agent to Company shall be that of independent contractor.

There was no provision of the contract which precluded the possibility of independent contractor status. Mr. Sloan was paid strictly on the basis of commissions from the policies he sold. Bankers Life did not withhold taxes from Mr. Sloan's paycheck, but rather accounted for the commissions paid to Mr. Sloan on a Form 1099. Bankers Life provided no vacations, holiday pay, or sick leave. Mr. Sloan determined his schedule, and the amount of time he was going to work, carrying out the sale of insurance on a self-directed basis. He provided his own transportation, and was not reimbursed for his travel expenses. Similarly, he provided his own administrative support at his own expense. Mr. Sloan was responsible for obtaining and maintaining any licenses or permits that were necessary to sell insurance in his assigned territory. Without specifically discussing all of the factors mentioned above, we can say the most important factors indicate that Mr. Sloan is an independent contractor. Bankers Life clearly retains some control of the means of Mr. Sloan's performance, by purporting to restrict his use of the turning 65 lists, and purporting to restrict him from soliciting the clients of other agents. However,

**6.** Revenue Ruling 87–41 enumerates the following factors, to be taken into consideration when determining whether a worker is an employee or an independent contractor: (1) whether a worker is required to comply with another's instructions as to when, where or how he is to work; (2) whether the worker is trained by the employer; (3) whether the worker's services are integrated into the employer's business operations; (4) whether the services must be rendered personally; (5) whether the worker hires, supervises and pays assistants; (6) whether there is a continuing relationship between the worker and the employer; (7) whether the employer has established set hours for the worker to work; (8) whether the employer's work requires the worker to work substantially full-time; (9) whether the work is done on the employer's premises; (10) whether a worker is required to perform the work in an order or sequence established by the employer; (11) whether the worker is required to regularly report to the employer; (12) whether the worker is paid on an hourly or weekly basis, or by-the-job or on a commission basis; (13) whether the worker is reimbursed by the employer for his work-related expenses; (14) whether the worker furnishes his own tools; (15) whether the worker invests in and maintains facilities from which he works; (16) whether the worker can realize a profit or loss; (17) whether the worker is working for more than one firm at a time; (18) whether the worker makes his services available to the general public; (19) whether the employer has the right to discharge the worker; and (20) whether the worker has the right to end his relationship with the employer at any time without incurring liability.

there is no showing that such restrictions are unusual with regard to independent sales representatives, or are so significant as to tip the scales toward employment status in view of the fact that the most significant factors related to control are more consistent with independent contractor status. In *Robinson v. Bankers Life & Cas. Co.*, 899 F.Supp. 848, 849 (D.N.H. 1995), the United States District Court for the District of New Hampshire found that a Bankers Life insurance agent, with an agent contract similar to Mr. Sloan's, was an independent contractor rather than an employee for the purposes of a discrimination claim brought under the ADA.

■ We have not found any authority to support the proposition that Mr. Sloan was an employee. Because we conclude that Mr. Sloan was not an employee of Bankers Life, we find that he did not have standing to bring a claim against Bankers Life under the MHRA. Thus, we need not determine whether the trial court erred in its dismissal of Mr. Sloan's age discrimination and retaliation claims for lack of subject matter jurisdiction. The trial court's action in dismissing the claims under the MHRA was not erroneous, even though the trial court's decision was based upon other grounds.

The trial court's dismissal of Mr. Sloan's age discrimination and retaliation claims under the MHRA is affirmed. Point III is denied.

## JNOV

### Standard of Review

■ In Point II, Sloan alleges that the trial court erred in granting Bankers Life's motion for JNOV on Sloan's claim of tortious interference with a business expectancy. A contention that the trial court improperly entered a JNOV raises the question of whether the plaintiff has made a submissible case. *Wion v. Carl I. Brown & Co.*, 808 S.W.2d 950, 952 (Mo.App.1991). We will affirm the trial court's grant of the JNOV only if we find that the plaintiff has

failed to present a submissible case. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996). In determining whether a submissible case has been made, we view the evidence in a light most favorable to the plaintiff, giving the plaintiff the benefit of all reasonable inferences that can be drawn from the evidence. *Id.* A presumption favoring the reversal of a grant of JNOV exists, unless the evidence and inferences favorable to the plaintiff leave no room for reasonable minds to differ as to the outcome. *Thoroughbred Ford, Inc. v. Ford Motor Co.*, 908 S.W.2d 719, 728 (Mo.App.1995).

### Tortious Interference With Business Expectancy

In its order granting Bankers Life's motion for JNOV, the trial court stated:

During pre-trial rulings in this case, I had grave doubts whether plaintiff had a business expectancy which could be interfered with. The doubts continued even when I denied the motion for directed verdict. I am now convinced that plaintiff did not have a business expectancy which could be interfered with. The only business expectancy in this case was defendant Bankers Life's. That business expectancy was that individuals would purchase insurance from Bankers Life. Bankers Life could not interfere with its own business expectancy. *White v. Land Clearance for Redevelopment Authority*, 841 S.W.2d 691 (Mo.App.1992).

The relationship plaintiff had with the people on the turning 65 lists he purchased was not one of business expectancy. It was a speculative hope, a possibility that one of these strangers would want to buy insurance from defendant. I should not have allowed the case to be tried on this issue. I deeply regret not having removed this issue before.

### Elements of Tortious Interference

■ Tortious interference with a business expectancy is comprised of five ele-

ments: (1) a contract, valid business relationship or expectancy; (2) defendant's knowledge of the contract, valid business relationship or expectancy; (3) defendant's intentional interference inducing or causing a breach of the contract or business relationship; (4) lack of justification for defendant's actions; and (5) resulting damages. *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 316 (Mo. banc 1993). Sloan bears the burden of proving each element with substantial evidence. *SSM Health Care, Inc. v. Deen,* 890 S.W.2d 343, 346 (Mo.App.1994). At the outset we must determine whether Mr. Sloan proved a reasonable or actual business expectancy. *See Gott v. First Midwest Bank of Dexter,* 963 S.W.2d 432, 438 (Mo.App.1998).

▇▇▇ In establishing the existence of an actual business expectancy, Sloan is not limited to showing that he had a contract with particular business clients. *Fischer, et al. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo. banc 1979). He does have to show that he had a reasonable expectation of "economic advantage or commercial relations." *Hartbarger v. Burdeau Real Estate Co.,* 741 S.W.2d 309, 310 (Mo.App. 1987). Missouri courts have recognized that a regular course of prior dealings suggests a valid business expectancy. *See, e.g., Rusk Farms, Inc. v. Ralston Purina Co.,* 689 S.W.2d 671, 679 (Mo.App.1985). However, "[l]iability ... cannot be predicated upon speculation, conjecture or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis." *Francisco v. Kansas City Star Co.,* 629 S.W.2d 524, 529 (Mo.App.1981).

▇▇▇ Mr. Sloan claims that he had a "valid business expectancy with respect to his policyholders and future prospects." His relationship to his "future prospects" cannot, however, be considered on equal footing with his relationship to his current policyholders. The change in Bankers Life's prospecting policy is not shown to

have affected Mr. Sloan's relationship with current policyholders. It affected only his right to call on future prospects from the "turning 65 lists." Therefore, our inquiry is properly focused on whether he had any relationship at all with those whose names appear on the prospect list. Mr. Sloan's claim of a business "expectancy" in the potential sale of Medicare supplement policies is actually based on the fact that the list of individuals turning 65 is a list of qualified prospects. Mr. Sloan has no course of prior dealings with these people, and no prior relationship to them. We agree with the trial court that the relationship Mr. Sloan had with the people on the "turning 65 lists" he purchased was not one of a business expectancy. Were we to hold otherwise, Sloan would ensure exclusive entitlement to contact the prospects on the list simply by notifying all other insurance agents, with any company selling Medicare supplement insurance, of his expectancy in the prospects on the list. Anyone interfering would be required to demonstrate justification for interfering. We do not think that is the law. We believe the prospects on the turning 65 lists are legally "up for grabs."

The trial court's grant of JNOV on Mr. Sloan's tortious interference with business expectancy claim is affirmed. Point II is denied.

### New Trial

Mr. Sloan also challenges the trial court's grant of a new trial on his claim of breach of good faith and fair dealing, which he addresses in points I, IV and V of his brief. In Point I, Mr. Sloan claims that the trial court erred by granting a new trial on his claim of good faith and fair dealing because the trial court believed that the jury instructions should have been packaged. Mr. Sloan argues that packaging the instructions was not appropriate because he submitted alternative claims of liability for which only one damage instruction was proper.[7] Mr. Sloan argues

---

**7.** Mr. Sloan initially argues that Bankers Life

waived any alleged error with respect to the

that the trial court abused its discretion when it granted a new trial on all issues relating to his good faith and fair dealing claim, rather than only on the issue of damages. Mr. Sloan claims that the alleged instructional error forming the basis of the trial court's decision related only to the issue of damages, not to the issue of liability.

## Packaged Instructions

When a new trial has been granted due to an alleged instructional error, we examine two issues: (1) whether the challenged instructions were erroneous; and (2) whether submitting the non-packaged instructions resulted in prejudice. *Meyer v. McGarvie*, 856 S.W.2d 904, 907 (Mo.App.1993). Generally, a trial court has great discretion in determining whether and how to package jury instructions. MAI 2.00. Without a showing of prejudice, we will not reverse the trial court's decision whether to package the jury instructions. *Howard Constr. Co. v. Teddy Woods Constr. Co.*, 817 S.W.2d 556, 562 (Mo.App.1991).

Jury instructions are typically packaged to simplify the submission of complex cases. *Id.* "The packaging requirement means that except for the general instructions given in all civil cases, *all* the instructions needed to resolve a particular claim are to be packaged together, so that each package is in fact a separate unit." *Johnston v. Allis–Chalmers Corp.*, 736 S.W.2d 544, 546 (Mo.App.1987). Mr. Sloan argues that "in all cases having more than one verdict form," instructions must be packaged in accordance with MAI 2.00. Mr. Sloan points out that in this case, there was only one verdict form, and therefore the packaging was not proper. However,

Mr. Sloan fails to supply any authority for this proposition.

A trial court's authority to grant a new trial is discretionary only as to issues of fact and not as to matters of law. *Lashmet v. McQueary*, 954 S.W.2d 546, 549 (Mo.App.1997). Generally, instructional error involves a matter of law. *Meyer*, 856 S.W.2d at 907. However, "verdict forms are not treated as instructions." *Affiliated Foods, Inc. v. Strautman*, 656 S.W.2d 753, 759 (Mo.App.1983). Therefore, verdict forms are not beyond the scope of the trial court's discretion to correct on a motion for new trial.

The question in this case involves the propriety of the verdict form, not the actual instructions that were submitted to the jury. Jury Instruction No. 6 addressed Mr. Sloan's claim of tortious interference with business expectancy against Bankers Life; Instruction No. 8 addressed Mr. Sloan's claim of tortious interference with business expectancy against Mr. Fischer. Both of these instructions asked for compensatory damages. Instruction No. 12 addressed Mr. Sloan's breach of good faith and fair dealing against Bankers Life and asked for compensatory damages. Instruction No. 14 gave the jury the option of awarding Mr. Sloan punitive damages on the tortious interference claims only.

Verdict Form A read as follows:

On the claim of plaintiff Frank Sloan for compensatory damages for tortious interference with prospective business relations against defendant Bankers Life, we, the undersigned jurors, find in favor of:

*Plaintiff Frank Sloan*

On the claim of plaintiff Frank Sloan for compensatory damages for tortious

---

trial court's failure to package the jury instructions because it failed to distinctly state the grounds for its objection at the instruction conference. Mr. Sloan's contention is without merit. At the instruction conference, Bankers Life stated, "[D]efendants would like to place on the record an objection to not using packaging." Bankers Life preserved

this claim of error in its motion for new trial: "The Court failed to package the instructions on Count I, including its damages instructions, separately from those on Count II." Thus, the issue of whether the jury instructions should have been packaged is properly before this court. Rules 70.03, 78.07.

interference with prospective business relations against defendant Norman Fischer, we, the undersigned jurors, find in favor of:

*Plaintiff Frank Sloan*

On the claim of plaintiff Frank Sloan for breach of the duty of good faith and fair dealing against defendant Bankers Life, we, the undersigned jurors, find in favor of:

*Plaintiff Frank Sloan*

Note: Complete the following paragraph only if one or more of the above findings is in favor of plaintiff Frank Sloan.

We, the undersigned jurors, assess the damages of plaintiff Frank Sloan at $ *400,000.00. Four hundred thousand dollars.*

The trial court granted, and we affirmed, a JNOV as to Mr. Sloan's tortious interference claims against both Bankers Life and Mr. Fischer. Therefore, the only claim at issue is Mr. Sloan's claim for breach of duty of good faith and fair dealing. Because the verdict form has not separated the allocation of damages for the tortious interference claim from those for the claim of breach of good faith and fair dealing, it is impossible to allocate the compensatory damage award between the two claims. The trial court recognized as much in its judgment, stating:

> [The breach of good faith and fair dealing] count should have been separated from the tortious interference by packaging instructions. If that had been done, I could separate the damage awards and let the count two verdict stand. However, there is no way of to know how much of the verdict can be attributed to each count.

■ The trial court did not abuse its discretion in awarding a new trial on the ground that the tortious interference claims against Bankers Life and Mr. Fischer, and the breach of good faith and fair dealing claim against Bankers Life

should have been packaged separately. Point I is denied.

**Scope of the New Trial**

In Point IV, Mr. Sloan argues that the trial court abused its discretion in granting a new trial on all the issues relating to his good faith and fair dealing claim instead of limiting the scope of the new trial to the issue of damages.

■ The trial court has great discretion when ruling on a motion for new trial. *Oventrop v. Bi–State Dev. Agency,* 521 S.W.2d 488, 492 (Mo.App.1975). The trial court abuses its discretion when the trial court's ruling is clearly against the logic of the circumstances then before it, and is so arbitrary and unreasonable that "it shock[s] the sense of justice" and "indicate[s] a lack of careful consideration." *Richardson v. State Highway & Transp. Comm'n,* 863 S.W.2d 876, 881 (Mo. banc 1993). "The trial court is presumed to have weighed and considered the evidence and the possibility of prejudice to the parties prior to rendering its decision regarding the extent of the new trial." *Phillips v. Lively,* 708 S.W.2d 369, 373 (Mo.App. 1986). "Where liability is fairly tried but error is found on the issue of damages, the ends of justice require that the finding of liability be sustained[.]" *Berry v. Federal Kemper Ins. Co.,* 621 S.W.2d 948, 954 (Mo. App.1981).

In its order granting a new trial, the trial court stated, "I believe there is such a cause of action [as breach of good faith and fair dealing] and plaintiff presented evidence to support submission of a claim under it." The trial court further stated that had he packaged the jury instructions, he would have been inclined to let the jury's verdict as to Mr. Sloan's breach of good faith and fair dealing claim stand. The trial court made no mention of any reason for granting the motion for new trial other than to address the issue of damages.

■ We see no reason for the trial court to revisit the issue· of liability because Bankers Life's liability for breach of good faith and fair dealing has already been decided by a jury, and the trial judge rejected Bankers Life's motion for judgment notwithstanding the verdict.[8] We have no reason to believe the trial court actually wishes to retry the liability issue, and we conclude that the failure to limit the order to a retrial of damages was simply a result of a lack of careful consideration. Therefore, we conclude the trial court abused its discretion in ordering a new trial on all of the issues relating to Mr. Sloan's breach of good faith and fair dealing claim. Consequently, we hold that the trial court's order is vacated to the extent that it orders a new trial on issues other than the damages. Point IV is granted.

## Exclusion of Evidence

In Point V, Mr. Sloan argues that the trial court erred when it excluded evidence that Bankers Life failed to enforce a non-compete clause against agents who had previously been employed by Bankers Life. Mr. Sloan claims that Bankers Life failed to enforce the non-compete clause solely for the purpose of punishing him for exercising his legal rights, and that such evidence was relevant to his claim of breach of good faith and fair dealing. .

The jury found Bankers Life liable for breach of good faith and fair dealing, even without the introduction of its failure to enforce the non-compete clauses. Because the scope of the new trial is limited to the issue of Mr. Sloan's damages, not Bankers Life's liability, we need not address Mr. Sloan's final point on appeal.

## Conclusion

The trial court's dismissal of Mr. Sloan's age discrimination and retaliation claims under the MHRA is affirmed. Further, the trial court's grant of JNOV on Mr. Sloan's claim of tortious interference with business expectancy is affirmed. To the extent that the trial court has ordered a retrial of the issue of liability for breach of good faith and fair dealing, that order is vacated. The scope of the new trial shall be limited to a determination of the damages on that claim. The case is remanded for a new trial on the issue of damages on the claim of breach of good faith and fair dealing.

ULRICH and SPINDEN, JJ., concur.

---

**8.** Bankers Life elected not to cross-appeal the denial of its motion for JNOV. Bankers Life, however, does not concede the submissibility of plaintiff's claim, arguing that plaintiff's claim was not submissible, and did not constitute a cause of action. These arguments are mentioned only as support for affirming the grant of new trial as to the entire claim. It is interesting that Bankers Life did not appeal the denial of the JNOV, because if plaintiff cannot make a submissible claim, it would not be expedient to retry the case. The issues related to the validity and submissibility of plaintiff's claim are not significantly developed by the parties in this appeal, and we decline· to wade into those murky waters, without the benefit of extensive and focused briefing. In any event, there is no point in retrying the entire case on remand, regardless of whether plaintiff has a submissible cause of action, because the trial court has shown no inclination to dismiss plaintiff's claim or block its submission. We express no opinion as to whether Bankers Life's contentions as to the validity and submissibility of plaintiff's cause of action are preserved for subsequent appeal.