Bonnie Sue HIGGINS d/b/a American
Cab Co. and City Cab Co.,
Appellant,

v.

MISSOURI DIVISION OF EMPLOY-
MENT SECURITY, Respondent.

No. WD 64572.

Missouri Court of Appeals,
Western District.

July 19, 2005.

Austin L. Mitchell, Salem, MO, for Appellant.

Ninion S. Riley, Jefferson City, MO, for Respondent.

Before ELLIS, P.J., and SPINDEN and HOWARD, JJ.

VICTOR C. HOWARD, Judge.

Bonnie Higgins ("Higgins") appeals from a decision by the Labor and Industrial Relations Commission ("the Commission"), which found that during the years of 1999 and 2000, and since January 1, 2001, cab drivers performed services for "wages" in "employment" by Higgins, within the meaning of those terms as defined in sections 288.034 and 288.036[1] of Missouri's Unemployment Law. Higgins raises two points on appeal. First, she claims that the Commission erred in finding that she "paid, albeit indirectly" the cab drivers. Second, Higgins claims that the Commission erred in finding the cab drivers were her employees rather than independent contractors.

For the reasons set forth below, we affirm the Commission's decision.

---

1. Unless otherwise noted, statutory references are to RSMo Cum.Supp.2004.

## Background[2]

Higgins solely owns and operates the only two public taxicab ("cab") businesses, which are known as City Cab Co. and American Cab Co., in Rolla, Missouri. In accordance with Chapter 38 of the Rolla City Code, which regulates the public cab business within the City's jurisdiction, Higgins maintains City licenses to operate her cab businesses, regularly notifies the City authorities of each cab actually in operation as a public cab, and maintains sufficient amounts of liability insurance to compensate for damages resulting from the operation of her businesses.

Higgins is a "hands-off" owner. She uses a management system that she inherited from her late father, who had once owned and operated a cab business. Higgins keeps the cabs for both businesses on a rented parking lot, adjacent to her boyfriend's car lot. Higgins owns twenty cabs, which she painted yellow with the names of either American or City Cab with the companies' phone numbers. However, Higgins indicated that there were rarely more than four cabs (two per company) in working condition. The keys are left in the operable cabs, which are left on the lot unlocked.

Any person ("the applicant") who is interested in driving a cab speaks to a current driver. That driver instructs the applicant to obtain a copy of his or her driving record.[3] After obtaining the record, the applicant gives it to a current driver, who then turns the record over to Higgins, to Higgins' boyfriend, or directly to Higgins' insurance company. Once the insurance company approves the applicant as an acceptable driver, the driver who had taken the application lets the applicant know that he or she can drive, and Higgins assigns the applicant an identification number to be reported on that driver's log sheets and daily summaries. Higgins then assigns the approved driver to drive a specific available cab.

Inside each operable cab is: a sheet for logging cab trips; an instruction sheet entitled "TAXI CAB DRIVERS RULES," the contents of which are set forth in our discussion of Point II; and a daily summary sheet. Except for dialysis patients, whose fares are paid by a third party to Higgins, all fares are paid to the driver in cash. The fare is $3 per trip anywhere within the Rolla city limits. Outside the city limits, a $1–per–mile surcharge is added to the fare. Before each shift, the driver is required to check the cab for oil, transmission, radiator, and steering fluids and to add more as needed. At the end of the shift, the driver is required to check the air pressure in the tires. Higgins authorizes the drivers to purchase gasoline for the cabs as needed, the cost of which is split 50–50 by the driver and Higgins. The drivers can also spend money on minor repairs, for which Higgins reimburses them. The cab drivers do not pay any costs or expenses, other than their one-half share of gas, in order to work for her. Despite a form Higgins has a driver sign acknowledging his or her responsibility for the $500 insurance deductible due to his or her negligence in any accident, Higgins pays the insurance deductible without recourse against the driver who causes damage to a cab in an accident.

The drivers are required to write down the time when each passenger is picked up, the place of pick-up, and the place

2. We borrow in part from the decision of the Appeals Tribunal, which the Commission affirmed and adopted, without further attribution.

3. Higgins indicated that her insurance company required the drivers to have a Class E driver's license.

where the passenger is dropped off. Additionally, the drivers are required to log the amount of the fare received from each passenger. At the end of each driving shift, each driver, on the summary sheet submitted to Higgins: (1) totals up the gross amount of fares collected, (2) subtracts the amount of gasoline purchased from the gross fares, and (3) keeps fifty percent of the cash balance. The driver leaves the remainder of the cash, plus a $3 fee charged by Higgins "to help pay for the logs," with the completed driving log and summary sheet in a sealed envelope. Someone, usually Higgins' boyfriend, then delivers the envelope to Higgins.

Higgins maintains a separate telephone number and a separate listing in the Rolla area telephone books for each of her cab companies. The telephone calls to both companies come into a phone system located in a Rolla office maintained by Higgins. A dispatcher does not answer the calls. Rather, Higgins installed a device on each telephone line that redirects the call directly to the cab belonging to the respective company. A cab driver answers the routed call from a phone device in the cab and either picks up the calling passenger himself or has another on-duty driver get the passenger. Higgins installed a monitoring and recording device on the phone system to keep track of the drivers by comparing the calls with their reported daily logs.

During the times relevant to this appeal, Higgins has filed income tax returns with the IRS using Form 1040 with attached schedules. For the tax year 2000, Higgins reported on Schedule C, as the sole proprietor of American Cab Co. and City Cab Co., that those businesses generated $134,641 in gross receipts and that she paid $107,178 in deductible costs for gasoline, vehicle repairs, insurance, telephone service, taxes, and licenses. She did not file W–2's (wage and tax statements) or 1099's (miscellaneous income) with the IRS with regard to the drivers. In the summer of 2003, an IRS agent examined Higgins' federal income tax returns and relevant records for the tax years 2000 and 2001. On August 12, 2003, the IRS reported to Higgins that she did not owe any additional tax and was not subject to any penalty.

On January 9, 2001, the Rolla office of the Division of Employment Security ("the Division") notified Higgins that it was going to audit her cab businesses' books and records. Over a year later, the Division notified Higgins that it had determined, as a result of the audit, that the cab drivers were paid remuneration, which constituted "wages" under section 288.036 of the Missouri Employment Security Law, for the drivers' services during the 1999 and 2000 tax years. Higgins appealed the Division's determination to the Appeals Tribunal. After conducting a hearing, the Appeals Tribunal affirmed the Division's determination. Higgins then applied for review of the Appeals Tribunal's decisions with the Commission. On August 11, 2004, the Commission affirmed and adopted the decision of the Appeals Tribunal. This appeal follows.

## Standard of Review

■■■■ Section 288.210, RSMo 2000, governs our review of the Commission's decision and states in relevant part:

The findings of the commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law. The court, on appeal, may modify, reverse, remand for rehearing, or set aside the decision of the commission on the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the decision was procured by fraud;

(3) That the facts found by the commission do not support the award; or

(4) That there was no sufficient competent evidence in the record to warrant the making of the award.

We will affirm the Commission's decision if we find, upon a review of the whole record that "there is sufficient competent and substantial evidence to support the [Commission's decision]." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003).[4] We defer to the Commission on issues of credibility. *See Tendai v. Mo. State Bd. of Registration for the Healing Arts*, 161 S.W.3d 358, 366 (Mo. banc 2005). However, we owe no deference to the Commission's conclusions of law or application of the law to the facts. *Hoover v. Cmty. Blood Ctr.*, 153 S.W.3d 9, 12 (Mo. App. W.D.2005).

### Point I

▆ In Higgins' first point on appeal she claims:

The Commission erred in finding that [she] "paid, albeit indirectly" the cab drivers because the weight of the evidence and the application of the law demonstrate that [she] did not pay the cab drivers, in that "splitting up a pot or till" is not payment by one party to the other, and that such absence of "payment" excludes [her] from coverage under the Missouri Employment Security Law.

We begin with the statutes and regulations relevant to Higgins' argument that she did not "pay" the cab drivers:

Section 288.034 provides in relevant part:

1. "Employment" means service, including service in interstate commerce, *performed for wages* or under any contract of hire, written or oral, express or implied, and notwithstanding any other provisions of this section, service with respect to which a tax is required to be paid under any federal unemployment tax law imposing a tax against which credit may be taken for contributions required to be paid into a state unemployment fund or which, as a condition for full tax credit against the tax imposed by the Federal Unemployment Tax Act, [26 U.S.C.A. § 3301 et seq.] is required to be covered under this law.

(Emphasis added.) Section 288.036.1 defines "wages" as that term is used in Chapter 288 in relevant part as: "all remuneration, *payable or paid,* for personal services including commissions and bonuses and ... the cash value of all remuneration paid in any medium other than cash." (Emphasis added.) Missouri Regulation 8 CSR 10–4.150, the stated purpose of which is to "ensure[ ] consistent interpretation of section 288.034.5," directs:

(1) In order to interpret section 288.034.5, RSMo, effective June 30, 1989, the division shall apply the common law rules applicable in determining the employer-employee relationship under [the Internal Revenue Code ("I.R.C.") ], Section 3306(i). In applying the provisions of [I.R.C.], Section 3306(i) the division shall consider the case law, Internal Revenue Service regulations and Internal Revenue Service letter rulings interpreting and applying that subsection.

---

**4.** We note that *Hampton* overruled, in part, a large number of cases applying a different standard of review. Some of those cases are relied upon in this opinion without further notation that they have been overruled in part on other grounds by *Hampton* or cases relying upon *Hampton's* standard of review analysis.

Higgins argues that the "key section ... regarding [the] threshold issue [of whether the cab drivers were 'paid'] is § 288.032.1," which defines an "employer" in relevant part as, "Any employing unit which in any calendar quarter in either the current or preceding calendar year *paid* for service in employment wages." (Higgins' emphasis.) Higgins claims that under the plain language of the words and terms of Chapter 288, wages were not "paid" by her to the cab drivers because, "there are no facts in evidence showing that [she], at any time, transferred to the cab drivers anything, checks or cash." Higgins then argues that the definition of "payment" as found in Black's Law Dictionary and federal case law requires a delivery of money or its equivalent by one person from whom it is due to another person to whom it is due, which is not present in this case.

■ Higgins relies on *Howard's Yellow Cabs, Inc. v. United States,* 987 F.Supp. 469 (W.D.N.C.1997), in support of her argument that the fare-splitting arrangement she had with the drivers did not constitute "payment" under Missouri's Unemployment Law. *Howard's* is inapposite. The issue in *Howard's* was whether the taxpayer, a cab company owner, was entitled to relief from past liability for federal employment taxes pursuant to section 530 of the Internal Revenue Act of 1978 (codified as amended at 26 U.S.C. § 3401 nt. (1993)), even if the cab drivers were determined to be its common law employees. *Id.* at 473. As explained therein:

> In 1978, Congress passed Section 530 of the Revenue Act of 1978 which "functions basically as a defense against liability determined by the Internal Revenue Service for misclassification of workers as 'independent contractors' instead of 'employees.'" *In re Rasbury,* 130 B.R. 990, 1003 (Bankr.N.D.Ala.

1991), *aff'd,* 141 B.R. 752 (N.D.Ala. 1992)....

. . . .

> Section 530(a) was enacted by Congress "in reaction to the perceived inconsistent and arbitrary action of the Internal Revenue Service in reclassifying independent contractors as employees." *Apollo Drywall, Inc. v. United States,* 71 A.F.T.R.2d (RIA) 1689 ([W.D.] Mich. 1993).... In enacting this provision, "Congress intended the section to serve as a safe haven, sheltering employers who had acted in good faith in treating workers as independent contractors." *Id.*

> *Irrespective of whether a worker is in fact an employee or an independent contractor,* § 530 protects taxpayers from subjective application by the IRS of the twenty common law factors applicable to determining the employer-employee relationship. *Queensgate Dental Family Practice, Inc.,* 68 A.F.T.R.2d (RIA) 5679 ([M.D.]Pa.1991). Indeed, § 530 "was designed explicitly to eliminate the need for courts to engage in the balancing of complex factual issues in determining whether an individual is an independent contractor or an employee under common law." *Id.,* (emphasis added); *see also Donovan v. Tastee Freez, Inc.,* 520 F.Supp. 899, 903 [(D.P.R.] 1981).

*Id.* at 475–76 (emphasis added.) Thus, *Howard's* considered the cab owner's past federal employment tax liability in light of a federal "safe harbor" statute to protect employers. *Id.* No such safe harbor provision exists under Missouri's Unemployment Law. Instead, the existence of the employer-employee versus independent contractor relationship for purposes of Missouri unemployment tax liability is determined by consideration of Missouri statutes and regulations. The decision in

*Howard's* "that [the cab owner] did not exercise control over all the proceeds such that the proceeds could be considered income to [the owner], or that the division of proceeds between [the owner] and its drivers constituted a 'payment' in the legal sense," *id.* at 479, is not binding upon this court.

Higgins argues that 8 CSR 10–4.150 directs that the Division *"shall"* consider federal case law in interpreting Missouri's Unemployment Law, such that the decision in *Howard's* and the cases cited by it in defining "payment" are binding upon the Division. However, 8 CSR 10–4.150 explicitly states that its purposes is only to "ensure[ ] consistent interpretation of section 288.034.5," which concerns the determination of whether "[s]ervice performed by an individual for remuneration" is "employment" under section 288.034.1, or whether "it is shown to the satisfaction of the division that such services were performed by an independent contractor." Section 288.034.5 goes on to direct that in so determining the employment relationship, "the common law of agency right to control shall be applied." Thus, the directive in 8 CSR 10–4.150 that the division "shall *consider* the case law, Internal Revenue Service regulations and Internal Revenue Service letter rulings" (emphasis added) relates to the consideration of whether the employer-employee relationship exists under the common law rules, which is the topic of discussion below in Point II. 8 CSR 10–4.150 does not, as argued by Higgins, dictate consideration of those outside sources for interpretation of words used in other definitional sections of Chapter 288. Even if it did, the Division shall "consider" those sources; it is not bound by them.

 As for the effect of any IRS determination that Higgins did not owe any penalties for not paying federal unemployment tax for the years 2000 and 2001 or not filing W–2's or 1099's, section 288.215.2, RSMo 2000, provides:

Any finding of fact, conclusion of law, judgment or order made by an arbitrator, commissioner, commission, administrative law judge, judge or any other person or body with authority to make findings of fact or law in any proceeding not brought under this chapter shall not be binding or conclusive on an appeals tribunal or the labor and industrial relations commission in any subsequent or separate proceeding brought under this chapter, regardless of whether the prior action was between the same or related parties or involved the same facts.

This reflects a legislative intent to prohibit proceedings outside the Missouri Employment Security Law from having a binding effect upon the Commission. Thus, any determination of Higgins' past federal tax liability is not binding upon the Commission.

Our legislature specifically codified the purpose of the Missouri Unemployment Law, Chapter 288, in section 288.020, RSMo 2000, as follows:

1. As a guide to the interpretation and application of this law, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to health, morals, and welfare of the people of this state resulting in a public calamity. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

2. This law shall be liberally construed to accomplish its purpose to promote employment security both by in-

creasing opportunities for jobs through the maintenance of a system of public employment offices and by providing for the payment of compensation to individuals in respect to their unemployment.

In construing the sections of Chapter 288, we must:

> ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning. Where the language of the statute is ambiguous or where its plain meaning would lead to an illogical result, then this court will look past the plain and ordinary meaning of a statute. Generally, statutes relating to the same subject are considered *in pari materia* .... Where two statutes concerning the same subject matter, when read individually, are unambiguous, but conflict when read together, this court will attempt to reconcile them and give effect to both.

*Nichols v. Dir. of Revenue,* 116 S.W.3d 583, 585–86 (Mo.App. W.D.2003) (quotations and citations omitted).

The Commission concluded that Higgins "paid remuneration in cash, albeit indirectly," to the cab drivers. As set forth above, section 288.036.1 defines "wages" in relevant part as: "all remuneration, *payable or paid,* for personal services[.]" The term "payment," the technical definition of which Higgins focuses heavily upon, is not used. According to BLACK'S LAW DICTIONARY 1128 (6th ed.1990), "A sum of money is said to be *payable* when a person is under an obligation to pay it." (Emphasis added.) We conclude that the portion of fares retained by the cab drivers each night, although never specifically under the dominion or control of Higgins, was "payable or paid" to the drivers as those terms are used in section 288.036.1.

There is no indication that our legislature intended, by use of only the term "paid" to define "employer" in section 288.032.1, to limit "wages" as defined in section 288.036.1 and as used in the definition of "employment" under section 288.034.1 to refer to only those moneys directly "paid" in a technical sense. Revenue generated in the businesses as structured by Higgins is first and foremost revenue of her cab companies. Because of the structure of Higgins' businesses, Higgins' cab companies must part with some of that revenue to compensate the drivers. The fact that Higgins employed the convenience of having the drivers pay themselves by retaining their portion of the fares rather than deliver the money to her for redistribution does not mean the drivers were not "paid" or that the wages were not "payable" within the context of section 288.036.1.

Additionally, as more fully developed in our discussion of Higgins' second point on appeal, we find that the drivers were employees of the cab companies. It follows that the fares collected by the drivers were the funds of their employer. Remuneration for their services became "wages" that were "payable or paid" from these funds regardless of the indirect method of payment used by Higgins.

Higgins' first point on appeal is denied.

## Point II

Higgins claims in her second point on appeal that the Commission erred in finding that the relationship between Higgins and the cab drivers was one of employment. Higgins claims that she retained or exercised only the right to control the results of the cab drivers' jobs, not the right to control the manner and means by which the cab drivers performed their jobs. Thus, Higgins claims that the weight of the evidence shows

that the cab drivers were independent contractors.

■ Section 288.034.5 provides:

Service performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that such services were performed by an independent contractor. In determining the existence of the independent contractor relationship, the common law of agency right to control shall be applied. The common law of agency right to control test shall include but not be limited to: if the alleged employer retains the right to control the manner and means by which the results are to be accomplished, the individual who performs the service is an employee. If only the results are controlled, the individual performing the service is an independent contractor.

Thus, there is a presumption that service performed by an individual for remuneration is "employment" subject to Missouri's Unemployment Law. The presumption is overcome by satisfying the Division "that such services were performed by an independent contractor." *Id.*

To aid in the consistent interpretation of section 288.034.5, 8 CSR 10–4.150 further directs, as set forth above, that the Division "shall apply the common law rules applicable in determining the employer-employee relationship under 26 U.S.C., Section 3306(i)," and that in doing so, the Division "shall consider the case law, Internal Revenue Service regulations and Internal Revenue Service letter rulings interpreting and applying that subsection." Pursuant to the regulation, Missouri courts have consistently considered twenty common law factors identified in IRS Revenue Ruling 87–41, 1987 WL 419174 to aid in determining the nature of the employment relationship. *See, e.g., Klausner v. Brock-*

*man,* 58 S.W.3d 671, 677–79 (Mo.App. W.D.2001); and *Nat'l Heritage Enters., Inc. v. Div. of Employment Security,* 164 S.W.3d 160, 166 (Mo.App. W.D., 2005). Those twenty factors are: (1) Instructions, (2) Training, (3) Integration, (4) Services rendered personally, (5) Hiring, supervising and paying assistants, (6) Continuing relationship, (7) Set hours of work, (8) Full-time required, (9) Work on employer's premises, (10) Order or sequence of set work, (11) Oral or written reports, (12) Payment by hour, week, or month, (13) Reimbursement of expenses or travel, (14) Furnishing tools and materials, (15) Significant investment, (16) Realization of profit or loss, (17) Works for more than one person or firm, (18) Offers services to the general public, (19) Right to fire, and (20) Right to quit. Rev. Rul. 87–41 at 298–99; *Klausner,* 58 S.W.3d at 677–79. As we explained in Klausner:

Since Rev. Rul. 87–41 was issued, the factors have always been intended as *guides* or *aids* in determining employment status. The factors are not intended to serve as a bright-line rule with no flexibility, but rather they are indices of control to assist the employer in attempting, for tax purposes, to determine the common law employment status of its workers. Not every factor is applicable in every situation, and each case is decided on the basis of its own facts. The degree of importance attached to each factor varies depending on the type of work and individual circumstances, and the relevant factors should be considered in inquiring about employment status with no one factor being decisive.

*Id.* at 680.

■ The "bedrock" of determining the employment relationship remains " 'the common law agency test of the right to control' " the manner and means of performance. *Travelers Equities Sales, Inc.*

*v. Div. of Employment Sec.*, 927 S.W.2d 912, 921 (Mo.App. W.D.1996) (quoting § 288.034.5, RSMo 1994). We must consider the objective facts of the relationship between Higgins and the drivers and the reasonable inferences drawn therefrom to reach the ultimate conclusion about Higgins' right to control the manner and means by which the results are to be accomplished. At one extreme of the continuum is "employment"; at the opposite extreme of the continuum is "independent contractor." It is easy to ascertain the legal nature of the work relationship at these extremes. However, as the facts of the relationship converge toward the center of the continuum, the line becomes more difficult to draw.

Higgins highlights factors tending to indicate that the cab drivers were independent contractors rather than her employees. We do not feel it is necessary to discuss in detail the application of each relevant factor in this case. While certain factors are indicative of Higgins' lack of control over the cab drivers, there is competent and substantial evidence that the facts here do not converge toward the center of the continuum. Rather, the facts tend toward the "employment" extreme.

At all relevant times, Higgins has owned American Cab Co. and City Cab Co. as a sole proprietor. The revenue-generating assets include the vehicles used as cabs and the city license to operate those vehicles as cabs. Higgins owns the license and the vehicles. The drivers are integral to Higgins' businesses in order to generate revenue from these assets.

In each of the cabs were "TAXI CAB DRIVERS RULES," by which Higgins explicitly details how the drivers are to perform their duties as follows: [5]

1. BE ON TIME FOR WORK.
2. WE DO NOT LEAVE WORK EARLY.
3. IF YOU SHOULD EVER BE LATE YOU WILL HAVE TO REMAIN AT WORK THAT DAY TO MAKE UP FOR THE TIME YOU WAS LATE.
4. ALL DRIVERS WILL CHECK THERE FLUIDS AND TIRES AT THE BEGINNING OF THERE SHIFT AND AT THE END OF THERE SHIFT.
5. ALL CHECK OUTS WILL BE TURNED IN EVERY DAY AT THE END OF THE SHIFT THERE WILL BE NO CHECK OUT WILL BE TOOK HOME WITH THE DRIVERS.
6. ALL CALLS WILL BE WROTE DOWN AND CALLED IN AS SOON AS THEY CALL YOU, YOUR CALLS ARE BEING RECORDED.
7. ALL DRIVERS WILL RADIO THERE PICK UP THERE DELIVERY AND PRICE OF THERE FARES AT ALL TIMES EVEN IF THEY ARE WORKING BY THERE SELFS.
8. YOUR CALL SHOULD BE PICKED UP WITHIN TEN MINS WHEN THAT CALL COMES IN YOU SHOULD BE WRITING DOWN THE TIME, IF YOU CANNOT PICK IT UP WITHIN THIS TIME IT SHOULD BE GIVEN TO THE OTHER SIDE.
9. ALL DRIVERS WILL WORK WITH THERE PARTNER WE

---

**5.** We recognize that there are grammatical and spelling errors in these rules but do not indicate "[sic]" for each.

WILL TAKE TURNS ON THE OUT OF TOWN RUNS, THIS DOES NOT MEAN JUST BY THE DAY.

10. ALL CALLS WILL BE LOGGED INCLUDING NO SHOWS NO MONEY OR WHAT EVER.

11. EVERY CALL WILL BE WROTE DOWN ON EVERY BODYS LOGEDEVEN IF THEY DO NOT PICK IT UP.

12. YOUR CAR WILL BE CLEANED OUT, EVERY DAY INSIDE FOR THE NEXT DRIVER, AND CUSTOMERS.

13. IF YOU ARE THE ONLY ONE WORKING ON YOUR SHIFT AND A OUT OF TOWN RUN COMES IN YOU SHOULD GIVE IT TO THE OTHER SIDE IF THEY HAVE TWO DRIVERS. IF YOU ARE WORKING WITH A NEW DRIVER HE SHOULD BE SENT OUT OF TOWN UNTIL HE KNOWS THE TOWN.

14. THERE WILL BE NO COMPANY TAKING THE OTHER COMPANYS CUSTOMER WHEN THEY ARE GIVE A CALL BY THE OTHER COMPANY.

15. WE DO NOT HAVE PERSONAL CALLS WE DO NOT TELL THE CUSTOMER TO ASK FOR YOU.

16. IF YOU ARE THE ONLY DRIVER OUT THERE AND YOU GET BE HIND WE DONOT TELL THE CUSTOMER YOU ARE THE ONLY DRIVER THE BEST THING TO SAY IS WE ARE A LITTLE BIT BEHIND.

17. IF YOU HAVE TO HAVE A DAY OFF AND IT IS NOT YOUR REGULAR SCHULED DAY OFF YOU WILL HAVE TO WORK YOUR SCHULED DAY OFF.

18. IF YOU NEED OFF FOR SOME REASON WE NEED AT LEAST A TWENTY FOUR HOUR NOTICE.

19. IF YOU ARE SHARING A CAR WITH SOME BODY IT IS BEST YOU PICK THAT DRIVER UP TO GO WITH YOU TO GAS UP AT THE END OF YOUR SHIFT.

20. WE DO NOT HAUL PEOPLE AROUND IN OUR CARS UNLESS THEY ARE PAYING CUSTOMERS FOR EXAMPLE FRIENDS, FAMILY, CAB DRIVERS NOT ON DUTY THIS IS DUE TO INSURANCE.

21. WE WILL BE NICE TO CUSTOMERS WE WILL HELP THEM LOAD AND UN LOAD GROCERYS.

22. ONE DRIVER WILL NOT TAKE ALL THE RUNS IF HE IS WORKING WITH A PARTNER WE WILL SHARE.

23. WE WILL MAKE NEW DRIVERS FELL WELCOME WE WILL NOT TALK ABOUT THEM BEHIND THERE BACKS.

24. WE WILL NOT TALK ABOUT THE DRIVER TO THE CUSTOMER YOU SHOULD HOLD UP FOR EACH OTHER.

25. ALL CARS HAS HUP CAPS IF YOU LOSE ONE IT IS YOUR RESPONSIBLY TO REPLACE IF YOU SHARE A CAR YOU SHOULD CHECK YOUR HUP CAPS WHEN YOU FUEL UP.

26. WE WILL NOT BE OUT OF OUR CAR MORE THAN FIVE MINS. AT A TIME.

OVER

27. WE WILL RADIO IN WHEN WE ARE GOING TO BE OUT OF THE CAR, FOR GROCERYS OR ANY THING ELSE.

28. ALL PREPAID MONEY WILL BE TURNED IN THE DAY YOU SELL THE CARD, ALL CARDS WILL BE COUNTED FOR OR YOU WILL HAVE TO PAY FOR THEM.

29. WE DO NOT HAVE CREDIT SO DO NOT EVEN BOTHER CALLING ME.

30. I DO NOT TAKE CHECKS IF YOU FELL UP ON YOUR SELF TO TAKE AND CHECK AND IT COMES BACK I WILL GET THE CHECK MONEY FROM YOU PLUS $25.00.

31. ALL OUT OF TOWN RUNS YOU WILL GET YOUR MONEY FROM THE CUSTOMER BEFORE YOU LEAVE TOWN, CAUSE IF YOU DONOT I WILL GET MY MONEY REGARDLESS.

32. WE DO NOT GIVE ANY DISCOUNT OWN OUT OF TOWN RUNS OR IN TOWN RUNS WHAT IS ON THE PRICE LIST IS WHAT I GET.

33. we do not go to our personal houses, if for some reason we have to go should not be more than once.

34. WE WILL NOT THROWN TRASH OUT AT THE SHOP.

35. WE WILL NOT ABUSE THE CAR, BECAUSE YOU ARE MAD AT SOME BODY WE WILL NOT DRIVE THE CAR MORE THAN SIXTY–FIVE ON INTER STATE.

36. TIME CALLS WILL BE PICKED UP FIRST FOR EXAMPLE IF YOU HAVE A TIME CALL AND ANOTHER CALL COMES IN YOU WILL GO AND GET YOUR TIME CALL FIRST. IT IS IMPORTANT TO BE ON TIME FOR THE TIME CALLS IF YOU ARE NOT BUSY YOU SHOULD BE SETTING IN THAT ZONES THE CLOSES TO YOUR TIME CALL.

37. WE HAVE ZONES THESE ZONES ARE SET UP TO MAKE EVERY BODY MONEY AND WEAR OFF THE CAR, WHEN YOU EMPTY YOUR CALL YOU SHOULD GO TO THE ZONE THAT IS THE CLOSES TO WHERE YOU EMPTY.

38. WE DO NOT GIVE OUT ANY INFORMATION ON THE DRIVERS OR CUSTOMERS OVER THE PHONE EXAMPLE ADDRESS WHERE YOU TOOL A CUSTOMER, ADDRESS OF THE DRIVERS.

39. WE DO NOT DISCUSS THE CARS WITH THE CUSTOMER.

40. IF YOU ARE HAVING A PROBLEM WITH SOME BODY COME AND DISCUSS IT WITH ME.

41. THERE WILL NOT BE ANY SLEEPING ON THE JOB.

THANK YOU,

BONNIE HIGGINS

Further, Higgins controls and monitors the phone systems, requires regular accountings of fares received and business-related expenditures from the drivers, and controls the advertising for her cab businesses. At no time have the drivers possessed any rights that restrict Higgins' authority to manage her businesses in any way. It was ideal short-term or part-time work for the drivers because they were immediately paid in cash, and, other than their time, they had no expenses.

The majority of Higgins' arguments on appeal concerning application of the twenty factors relate to her decision to be a "hands off" manager. Higgins continually argues that she did not *actually* control the manner and means by which the cab drivers performed their services. However, as explained in IRS Revenue Ruling 71–572, 1971 WL 26813,, it is "not necessary that the employer actually direct and control the manner in which services are performed; it is sufficient if he [or she] has the right to do so." Higgins' unrestricted ownership and authority to manage unequivocally show that she retains an unrestricted *right* to direct and control the manner and means of the cab drivers' performance. Higgins' decision not to overtly exercise that right is not determinative. Higgins failed to overcome the presumption in section 288.034.5 that the services performed by the cab drivers were in the employment of Higgins.

Higgins' second point on appeal is denied.

## Conclusion

There is sufficient competent and substantial evidence to support the Commission's decision that for the relevant years the cab drivers performed services for "wages" in "employment" by Higgins within the meaning of those terms as defined in sections 288.034 and 288.036. Accordingly, we affirm the decision.

ELLIS, P.J., and SPINDEN, J., concur.