STATE of Missouri ex rel. Anatoly SIR, Complainant/Appellant/Cross–Respondent,

v.

GATEWAY TAXI MANAGEMENT COMPANY d/b/a Laclede Cab Company, Respondent/Respondent/Cross–Appellant,

Missouri Commission on Human Rights, Additional Party/Respondent.

Nos. ED 98703, ED 98715.

Missouri Court of Appeals, Eastern District, Division Two.

April 16, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 23, 2013.

Application for Transfer Denied June 25, 2013.

480

Eli Karsh, Liberman, Goldstein & Karsh, Kurt Cummiskey, St. Louis, MO, for appellant.

Brian E. McGovern, Bryan M. Kaemmerer, McCarthy, Leonard, Kaemmerer, L.C., Chesterfield, MO, for respondent Gateway Taxi.

Chris Koster, Attorney General, Vanessa Howard Ellis, Assistant Attorney General, St. Louis, MO, for additional party Missouri Commission on Human Rights.

KATHIANNE KNAUP CRANE, Presiding Judge.

Respondent taxicab company appeals, and complainant taxicab driver applicant cross-appeals, from the judgment of the circuit court entered on judicial review of the Decision and Order of the Missouri Commission on Human Rights (the Commission). The Attorney General (the A.G.) had filed an amended complaint that alleged that respondent had discriminated against complainant in violation of the Missouri Human Rights Act (MHRA), section 213.055 RSMo (2000),[1] when it refused to consider complainant's application to become a taxicab driver because he had suffered a stroke, even though he was capable of performing the job of a taxicab driver. The Commission concluded that respondent was an employer under the MHRA; that complainant had a disability that did not interfere with performing the job of a taxicab driver; that the disability was a contributing factor in respondent's refusal to hire complainant; and that complainant could perform the job of a taxicab driver. Among other relief, the Commission ordered respondent to pay complainant damages in the amounts of $50,000 for humiliation and emotional distress and $35,000 for deprivation of his civil rights.

On appeal, respondent challenges the Commission's findings that (1) respondent's taxicab drivers are employees, not independent contractors, and (2) complainant is disabled as defined by section 213.010(4) of the MHRA. It also challenges the amounts of damages awarded to complainant. On cross-appeal, complainant challenges the Commission's failure to award him back pay and punitive damages. He also challenges an action taken by the circuit court.

We affirm for the following reasons: (1) Respondent's taxicab drivers were employees and not independent contractors under Missouri law applicable in MHRA cases; (2) the finding that complainant was disabled as defined by section 213.010(4) of the MHRA was supported by competent and substantial evidence of the physical limitations resulting from complainant's stroke, and evidence that complainant was restricted in performing a job or a class of jobs was not required; (3) the actual damage awards were supported by competent and substantial evidence; (4) the Commission did not err in failing to award back pay when back pay was not requested; (5) the MHRA does not authorize the Commission to award punitive damages; and

---

**1.** All further statutory references are to RSMo (2000) unless indicated otherwise.

(6) complainant's point challenging an action of the circuit court is unreviewable because it is not addressed to an error of the Commission.

## FACTUAL BACKGROUND

### Relationship between Respondent and its Drivers

Respondent, Gateway Taxi Management Company, doing business as Laclede Cab Company, operated approximately 120–140 taxicabs. They were painted red, bore the name "Laclede Cab," and were equipped with a radio and a meter. Respondent had permits for its drivers. Respondent leased the taxicabs to the drivers for twelve or twenty-four hour shifts. Respondent provided liability insurance; vehicle maintenance, including oil changes; and a charge system for payment of fares. Respondent also provided customers for its drivers through a radio dispatch system. The dispatcher informed the drivers of a customer's location, and drivers responded by giving their locations. The job went to the driver who was closest to the customer.

Drivers were responsible for paying the leasing fee and gas and for keeping the taxicab clean. Drivers received fares from customers and were entitled to keep all fares and tips, in excess of the leasing fee. Respondent did not keep records of the drivers' receipts.

Respondent advertised when it had openings for taxicab drivers. The advertisements were for full-time positions. Respondent required prospective drivers to be at least twenty-four years old, have a Class E Chauffeur's license, pass a test exhibiting knowledge of various geographic locations in the area, communicate effectively in English, lift luggage up to seventy pounds, and assist passengers. To apply for a driving position, applicants were required to come to the office, complete a taxicab driver application, and undergo an interview.

Before respondent would hire a driver, the driver had to sign an independent contractor lease agreement, pass both a drug test and a physical, and supply a police report. Respondent would then send the prospective driver to the Metropolitan Taxicab Commission (MTC) to get an MTC taxi driver's license. An applicant for an MTC license must present documentation showing that the company has accepted the licensee as a driver. When the MTC issues a license, the license is limited to the company for whom the driver is driving.

If respondent hired a driver, he or she could have an "open shift" for twenty-four hours a day or a twelve-hour shift. Respondent provided its drivers with two days of training during which they watched a safe driving film and were taught to use the taxicab's dispatch system, meter, charge cards, and how to handle different situations, such as assisting customers or an accident.

### Chronology

Complainant, Anatoly Sir, who had been a taxicab driver in Russia, began driving a taxicab in the United States in 1992. He continued to drive a taxicab for various companies until August 1998, when he suffered a stroke. After he was released from the hospital and completed physical therapy, complainant passed a hospital-administered medical examination and was permitted to drive. Complainant resumed driving a taxicab for a series of taxicab companies for approximately five years, up until October 2004, when he stopped driving for his last taxicab company because of mechanical problems with the taxicab. After his stroke, complainant was able to work as a taxicab driver up to twelve to fourteen hours a day and was able to lift luggage. In 2004, complainant had a current MTC taxi driver's license for his last

company, which he had obtained by submitting a drug test, police report, traffic report, and physical examination.

In October 2004, complainant saw respondent's advertisement for taxicab drivers and went to respondent's office, filled out an application, and made an appointment to return for an interview. When complainant returned for the interview, respondent's then-president, Jerry Standley, came out to meet complainant with complainant's application in his hand. Mr. Standley looked at the application and said it was "very good." Complainant was seated at a table in the lobby; he lifted his left arm with his right arm, stood up, and stumbled. Mr. Standley asked, "What's up with your left hand ... You got stroke." Mr. Standley said he would not take complainant because he did not "want to have problems with [the] insurance company." Then he told complainant to "get out." The interview lasted approximately two or three minutes. Respondent did not hire complainant.

After this interview, complainant felt angry, upset, embarrassed, degraded, and humiliated. Complainant testified that Mr. Standley talked down to him like he was a "slave" or "garbage," and treated him like he was homeless and asking for change. Complainant testified that for approximately two months after the interview, he experienced insomnia, depression, and pressure in his chest. Complainant further testified that he also experienced marital friction and loss of self-esteem, customers, and income.

## PROCEDURAL BACKGROUND

On November 22, 2004, complainant filed a charge of disability discrimination against respondent with the Commission.

The A.G., on behalf of the Commission, filed a First Amended Complaint with the Commission. The original administrative proceedings, which included a hearing before a hearing examiner,[2] ended with the Commission's dismissal of the complaint. Complainant filed a petition for judicial review with the circuit court. The court granted complainant's petition and remanded the matter to the Commission for reconsideration. On reconsideration, a different hearing examiner read and reviewed the evidence and case materials and issued an Amended Recommended Decision on Remand. The hearing examiner concluded that respondent was an employer under the MHRA; that complainant had a disability that did not interfere with performing the job of a taxicab driver; that the disability was a contributing factor in respondent's refusal to hire complainant; and that complainant could perform the job. The Commission subsequently adopted the hearing examiner's Findings of Fact and Conclusions of Law, and it entered a Decision and Order awarding damages and other relief to complainant.

Both complainant and respondent filed petitions for judicial review of the Commission's decision. The circuit court entered an Order and Judgment granting complainant's petition for judicial review in part by awarding him $20,995 in prejudgment interest. It denied complainant's petition for judicial review in all other respects, and it denied respondent's petition for judicial review.

## DISCUSSION

### Standard of Review

Article V, section 18, of the Missouri Constitution provides for judicial review of

---

**2.** Complainant was present at the hearing. He was advised that he had the right to hire an attorney, and that the attorney had a right to file a motion to intervene to make complainant a party to the case. Complainant testified that he understood these rights, but he chose not to exercise them.

administrative actions to determine "whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." Mo. Const. art V, sec. 18; *Lagud v. Kansas City Bd. of Police Com'rs,* 136 S.W.3d 786, 791 (Mo. banc 2004). On appeal from a judgment of a circuit court on judicial review of an administrative decision in a contested case, we review the administrative agency's decision, and not that of the circuit court. Section 536.140.2 RSMo (Cum.Supp.2006); *MCHR v. Red Dragon Restaurant, Inc.,* 991 S.W.2d 161, 165 (Mo.App.1999). We review to determine whether the agency action:

(1) Is in violation of constitutional provisions;

(2) Is in excess of the statutory authority or jurisdiction of the agency;

(3) Is unsupported by competent and substantial evidence upon the whole record;

(4) Is, for any reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;

(6) Is arbitrary, capricious or unreasonable;

(7) Involves an abuse of discretion.

Section 536.140.2 RSMo (Cum.Supp.2006); *Lagud,* 136 S.W.3d at 791; *Red Dragon,* 991 S.W.2d at 165.

### RESPONDENT'S APPEAL

### I. *Employee or Independent Contractor*

For its first point, respondent maintains that the Commission erred in determining that its taxicab drivers are employees because there was no competent and substantial evidence to support this conclusion in that respondent does not exert control over the means and manner in which taxi-cab drivers perform their jobs because (1) it does not have a financial motive to exert control because the drivers retain all fares collected in excess of the taxicab's daily rental fee, and (2) the regulation of taxicab drivers' on-the-job conduct is governed by the Metropolitan St. Louis Vehicle for Hire Code.

### A. *Applicable Law*

█ The MHRA applies to employment applicants; it does not apply to those seeking work as independent contractors. *See Howard v. City of Kansas City,* 332 S.W.3d 772, 779–84 (Mo. banc 2011). Section 213.055.1 provides:

1. It shall be an unlawful employment practice:

(1) For an *employer,* because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual:

(a) To fail or refuse to hire or to discharge any *individual,* or otherwise to discriminate against any *individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability;

(b) To limit, segregate, or classify his *employees* or his *employment applicants* in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status and an employee, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability[.]

Section 213.055.1 (emphasis added).

The MHRA defines "employer:"

**"Employer"** includes the state, or any political or civil subdivision thereof, or any person employing six or more persons within the state, and any person

directly acting in the interest of an employer, but does not include corporations and associations owned and operated by religious or sectarian groups[.]

Section 213.010(7). However, the MHRA does not define "employee," "employment applicant," or "independent contractor."

Respondent argues that *Sloan v. Bankers Life & Cas. Co.*, 1 S.W.3d 555, 562 (Mo.App.1999), is the most factually analogous case and provides the proper analysis of the distinction between an employee and an independent contractor under the MHRA. We disagree.

In *Sloan*, the appellate court held that the plaintiff, a commission-based insurance agent who worked for the defendant, was an independent contractor, and not an employee of the defendant, and affirmed the trial court's dismissal of the plaintiff's MHRA claim against the defendant. *Id.* at 564. In that case, the plaintiff obtained his own licenses and sold the defendant's financial products to customers whom the agent acquired on his own using his own office, supplies, transportation, and administrative support. In reaching its conclusion, the appellate court looked at factors used to distinguish an employee from an independent contractor in workers' compensation and unemployment compensation cases. *Id.* at 562. It set out section 288.034.5, which requires the common law of agency right-to-control test to be applied in unemployment cases and case law applying common law rules used in determining the nature of the employer-employee relationship under § 3606 of the Internal Revenue Code. *Sloan*, 1 S.W.3d at 562. It also set out the twelve factors to be considered under federal common law and the twenty factors identified by the IRS in Revenue Ruling 8-44 to be considered in determining whether a worker is an employee or an independent contractor. *Sloan*, 1 S.W.3d at 562–63. It utilized all

of these factors in making its determination that the plaintiff was an independent contractor. *Id.* at 564.

In *Howard*, the Missouri Supreme Court was confronted with the issue of whether a municipal judge was an "employee" within the scope of the MHRA. The defendant city relied on *Sloan* and a workers' compensation case to argue that a municipal judge was an independent contractor. *Howard* rejected this argument. 323 S.W.3d at 781–82. The court first found *Sloan* was factually inapposite. It then observed that with the exception of *Sloan*, almost all Missouri cases that apply a common law analysis to distinguish employees from independent contractors are concerned with workers' compensation liability or *respondeat superior* liability. *Id.* However, the court held that in MHRA cases, the definition of "employee" was not so restricted.

> Whether an individual is an employee for purposes of receiving workers' compensation benefits or for purposes of holding the employer liable for its tortious acts involves different considerations than whether an individual is entitled to protection as an employee under the MHRA.

*Id.* at 781.

In analyzing whether municipal judges were employees, the *Howard* court did not use or weigh any of the enumerated factors considered in *Sloan*. Rather, it gave the words used in the MHRA their plain and ordinary meaning. *Id.* at 780. In that regard, it consulted dictionary definitions of "employee" and "employ:"

> The word "employee" is commonly defined as "one employed by another, usually in a position below the executive level and usually for wages," as well as "any worker who is under wages or salary to an employer and who is not excluded by agreement from consider-

ation as such a worker." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 743 (1993). To "employ" means "to provide with a job that pays wages or a salary or with a means of earning a living." *Id.* There is no dictionary definition for "employment applicant."

*Id.*

Likewise, in determining that municipal judges were not independent contractors, a term not defined by statute, the court consulted definitions of the term "independent contractor" that it had adopted in its prior cases:

> This Court has generally described an independent contractor as "one who contracts to perform work according to his own methods without being subject to the control of his employer except as to the result of his work." *State ex rel. MW Builders, Inc. v. Midkiff*, 222 S.W.3d 267, 270 (Mo. banc 2007).

*Id.* at 782. "Independent contractors are typically hired to complete a specific task, use their own tools in completing their work, are paid a fixed sum on a by-the-job basis, and are not provided with benefits." *Id.* at 781.

The court considered the evidence in light of these definitions and determined that full-time municipal judges who were designated and treated as employees were employees of the municipality that provided them with a salary, benefits, workspace, and supplies even though the municipality did not control the result of the judges' work. *Id.* at 782. It determined that the evidence that municipal judges were treated as employees "run[s] counter to any assertion that the judges are independent contractors and further emphasize[s] why the common law analysis applied in independent contractor cases simply does not fit." *Id.* at 783. It concluded that despite the municipality's "lack of control of judi-cial decision-making, these facts, taken as a whole, support a legal determination that municipal judges are employees." *Id.*

As the last controlling opinion of the Missouri Supreme Court, the *Howard* approach prevails over the *Sloan* approach in analyzing whether a worker is an employee under the MHRA.

**B. *Commission's Finding***

The Commission used the same definition of independent contractor that the Supreme Court recited in *Howard.* It determined that respondent's drivers were not independent contractors because "the company owned the cars, the company trained the drivers in how to perform, the company's dispatcher sent drivers to get fares based on where the drivers were and what direction they were headed, and driving a Laclede Cab taxi was a full-time job." It reached the same conclusion when it applied the common-law factors from *Sloan.* It found:

> driving a taxi was the regular business of Laclede Cab, the work was basically unskilled labor and definitely not a profession, there was no term to the contract of employment, and while the work was not done under direct supervision through the day, the drivers were directed by the dispatcher to pick up fares. We also note that the driver did not supply anything except to pay a nominal daily "lease" for use of the cab.

It also concluded that neither calling an employee an independent contractor nor having the drivers sign an "independent contractor contract," which respondent had its drivers sign, creates independent contractor status under Missouri law, citing *National Heritage Enterprises, Inc. v. Division of Emp. Sec.*, 164 S.W.3d 160, 165 (Mo.App.2005), and *SkillPath Seminars v. Summers*, 168 S.W.3d 465, 470 (Mo.App. 2005).

## C. Control

■ Respondent's point relied on is directed to whether there was competent and substantial evidence that respondent asserted control over the means and manner in which the taxicab drivers perform their jobs. Respondent argues that it did not exercise control over drivers for two reasons: 1) It did not have a financial motive to exercise control; and 2) the regulation of the drivers' conduct was governed by the Metropolitan St. Louis Vehicle for Hire Code. We consider each argument in turn.

### 1. Lack of Financial Motive

Respondent argues that it had no financial motive to control the drivers' conduct because it received a fixed licensing fee, which did not depend on how the driver conducted his or her business. It relies on *Yellow Taxi Co. of Minneapolis v. N.L.R.B.*, 721 F.2d 366 (D.C.Cir.1983), which held that taxicab drivers who drive taxis under leases that provided they were independent contractors were not employees for purposes of the National Labor Relations Act (NLRA), 29 U.S.C. § 152(3) (1976). The NLRA used a right-to-control test to distinguish employees and independent contractors. *Yellow Taxi*, 721 F.2d at 374. *Yellow Taxi* held that the most important factor under this test was the extent of actual supervision exercised by a putative employer over the "means and manner" of the worker's performance. *Id.* It held that there was a strong inference that a taxicab company does not exert control over the means and manner of a taxicab driver's performance if the taxicab company only receives a fixed licensing fee because in such a case, it would have no incentive to exert control over its drivers. *Id.*

Respondent has not cited any Missouri case that has adopted or applied this infer-ence in an MHRA case or in any other case. Further, we do not find *Yellow Taxi* persuasive. First, *Yellow Taxi* considered the distinction between an employee and an independent contractor under the NLRA, not under the MHRA. Second, in comparable fact situations, Missouri cases have given less weight to lack of control over a driver's performance and more weight to the facts that the putative employer owned the vehicles, and the drivers were integral to generating revenue. *See K & D Auto Body v. Division of Employ. Sec.*, 171 S.W.3d 100, 114 (Mo.App.2005); *Higgins v. Missouri Div. of Employment Sec.*, 167 S.W.3d 275, 284 (Mo.App.2005). *K & D Auto Body* and *Higgins* are significant because they were decided under a common law analysis, which places more emphasis on control of the means, manner, and results of a worker's performance than *Howard* places in MHRA cases. However, neither *K & D Auto Body* nor *Higgins* found the lack of control over the driver's driving to be dispositive.

*K & D Auto Body* involved a towing service. K & D owned several tow trucks and engaged individuals to drive the tow trucks pursuant to an agreement that provided that the driver was an independent contractor who would be paid one-third the total charge for each job and would be responsible for paying K & D up to $1,000 in damages sustained in any accident. K & D appealed from an order of the Labor and Industrial Relations Commission determining that its tow truck drivers were employees and not independent contractors under the Missouri unemployment statute.

On appeal, the court reviewed the factors under the IRS twenty-factor test and determined that ten factors indicated employee status and ten factors were either neutral or indicated independent contractor status. *K & D Auto Body*, 171 S.W.3d

at 112. It specifically found that with respect to IRS Factor 1, "Instructions," K & D did not control the time, place or manner the towing work was done, and that this factor favored independent contractor status. *Id.* However, it gave more weight to the factors supporting employee status, including that the success and continuation of the business was dependent on the services provided by the tow truck drivers, the towing services were personally rendered by the drivers, there was a continuing relationship with the drivers, the drivers made no investment in facilities or workspaces for the performance of their jobs, and the company retained the right to discharge or terminate the drivers. *Id.* at 114. It then determined that K & D's practice of supplying equipment with substantial value and providing insurance coverage was a factor that must be given considerable weight. *Id.* It concluded that the tow truck drivers were employees under section 288.034.5. *Id.*

In *Higgins,* the court applied the common law agency test and the IRS twenty-factor test to affirm the Labor and Industrial Relations Commission's finding that a taxicab driver was an employee and not an independent contractor for the purposes of the Missouri unemployment laws. 167 S.W.3d at 284. It found that the proprietor of the taxicab company owned the revenue generating assets, which included the taxicabs and the city license to operate them, and that as a result, the drivers were integral to the business to generate revenue from these assets. *Id.* Although the proprietor argued that she was a "hands off" manager who did not actually control the manner and means by which the taxicab drivers performed their services, the court held that the proprietor's "unrestricted ownership and authority to manage unequivocally show that she retains an unrestricted *right* to direct and

control the manner and means of the cab drivers' performance." *Id.* at 287.

### 2. *Vehicle for Hire Code*

Respondent's remaining assertion is that competent and substantial evidence did not support a finding of control because the regulation of a taxicab driver's conduct is governed by the Metropolitan St. Louis Vehicle for Hire Code. It cites two cases that hold that control under Factor 1, "Instructions," of the IRS twenty-factor test is not shown when the worker's conduct is solely controlled by government regulation and not by the putative employer: *K & D Auto Body,* 171 S.W.3d at 106 (holding tow truck drivers were employees for purposes of the Missouri unemployment statutes), and *Travelers Equities v. Div. of Emp. Sec.,* 927 S.W.2d 912, 921 (Mo.App.1996) (holding broker's registered representatives were independent contractors for purposes of the Missouri unemployment statutes).

■■■■ Respondent has not provided a copy of this Code in the record on appeal and does not indicate that this Code was introduced into evidence. Unlike state statutes, municipal ordinances must be proven by introducing them into evidence at trial. *Wheeler ex rel. Wheeler v. Phenix,* 335 S.W.3d 504, 515 (Mo.App.2011). As a general rale, a court may not take judicial notice of the existence or contents of municipal ordinances. *Consumer Contact Co. v. State Dept. of Rev.,* 592 S.W.2d 782, 785 (Mo. banc 1980). Likewise, ordinances must be introduced into the administrative agency record. *See Gannett Outdoor Co. v. Zoning Adjustment,* 943 S.W.2d 359, 361–362 (Mo.App. 1997); section 536.070. We cannot take judicial notice of ordinances that have not been introduced in trial or administrative proceedings and consequently are not in the record on appeal. *Heuer v. City of*

*Cape Girardeau,* 370 S.W.3d 903, 910 n. 3 (Mo.App.2012); *Board of Educ. of City of St. Louis v. Daly,* 129 S.W.3d 405, 408 (Mo.App.2004).

■ Because the Vehicle for Hire Code was not in evidence before the Commission and, as a result, not in the record on appeal, we cannot determine whether or the extent to which this Code controls respondent's taxicab drivers' conduct. Moreover, even if this ordinance had been in evidence and respondent had demonstrated that the ordinance, and not respondent, controlled the drivers' performance, it would not be dispositive. *See K & D Auto Body,* 171 S.W.3d at 106–07, 113–14.

The Commission's finding that respondent's taxicab drivers are employees and not independent contractors is supported by substantial and competent evidence based on the record as a whole. Point one is denied.

## II. *Disability*

For his second point, respondent asserts that the Commission erred because there was no competent and substantial evidence to support its conclusion that complainant was substantially limited in the major life activity of working, in that there was no evidence that complainant was significantly restricted in his ability to perform a class of jobs or a broad range of jobs in various classes.

■ Section 213.055 of the MHRA makes it an unlawful employment practice for employers to discriminate against prospective and current employees "because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual." In order to establish a *prima facie* case of disability discrimination under the MHRA, a complainant must show (1) that complainant is statutorily "disabled;" (2) that the employer failed to hire complainant for a position; (3) and that complainant's disability was a factor in the decision not to hire complainant. *City of Clayton v. Com'n on Human Rights,* 821 S.W.2d 521, 527 (Mo.App.1991).

Section 213.010(4) defines the term "disability" as a "physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job." Thus, in order to be disabled under the MHRA, a person must have an impairment that substantially limits a major life activity, but, with or without reasonable accommodation, does not impair his or her ability to perform the essential functions of the potential job. *Medley v. Valentine Radford Communications,* 173 S.W.3d 315, 320 (Mo.App.2005); *see also* 8 C.S.R. 60–3.060(1)(F).

■ The regulations define "major life activities" as "those life activities which affect employability such as communication, ambulation, self-care, socialization, education, vocational training, employment and transportation." 8 C.S.R. 60–3.060(*l*)(C). An employee is "substantially limited in performing a major life activity for purposes of the MHRA if he was 'unable to perform' or 'significantly restricted as to the condition, manner or duration under which' he could perform a particular major life activity." *Daugherty v. City of Maryland Heights,* 231 S.W.3d 814, 821 (Mo. banc 2007) (quoting *Epps v. City of Pine Lawn,* 353 F.3d 588, 592 (8th Cir. 2003)).

In its Decision and Order, the Commission set out the definition of "major life activity" from 8 C.S.R. 60–3.060(*l*)(C) and then found:

Both this Commission's prior recommended decision and the Circuit Court's

order reversing that decision found that Sir had a physical impairment, Laclede Cab does not seriously argue the point, and we agree with the previous decision and order. Sir had a stroke in 1998 and had surgery on his brain. As a result of the stroke, his left side was very weak. He has only 50–60% use of his left leg, and he walks with a limp. His left arm is also limp, and he has only been able to regain 50% use of that arm. Sir can stand for a two-hour period, but it is difficult for him. Sir's experience in trying to obtain employment after his stroke leads us inescapably to conclude that his physical impairment substantially limits the major life activity of employment.

Respondent argues that the Commission only found that complainant's physical impairment limited the major life activity of employment, and that a " 'substantial limitation on the major life activity of working means that an individual must be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.' " *Daugherty*, 231 S.W.3d at 821–22 (quoting *Epps*, 353 F.3d at 592). Respondent also argues that complainant did not show that he could not perform the job of a taxicab driver.

We disagree with respondent's characterization and analysis. In the first place, the passage from *Daugherty* only applies to a limitation on the major life activity of "working," and describes the evidence relevant to establishing a substantial limitation on that major life activity. *Daugherty*, 231 S.W.3d at 821–22. However, "working" or "employment" are not the only major life activities that affect employability. As we have previously set out, 8 C.S.R. 60–3.060(*l* )(C) also includes communication, ambulation, self-care, socialization, education, vocational training and transportation.

The Commission recognized that the definition of "major life activity" includes all of these life activities that affect employability. One of these major life activities is ambulation. The Commission recited evidence that on its face shows complainant's problems with ambulation have affected his employability. The Commission's finding that complainant's "experience in trying to obtain employment after his stroke leads us inescapably to conclude that his physical impairment substantially limits the major life activity of employment" does not require us to reverse in the absence of the evidence described in *Daugherty*. The evidence that complainant's stroke had impeded his ability to ambulate was sufficient evidence that complainant was substantially limited in performing the major life activity of ambulation and was sufficient standing alone to support the finding that complainant was statutorily disabled. Point two is denied.

### III. *Amounts of Damages*

For his third point, respondent contends that there was no competent and substantial evidence to support the Commission's damage awards to complainant of $50,000 for humiliation and emotional distress and $35,000 for deprivation of complainant's civil rights because 1) the First Amended Complaint sought only $10,000 in damages, and 2) the amounts of damages awarded are arbitrary, capricious, or unreasonable.

#### A. *First Amended Complaint—Damage Amount Requested*

We first consider the assertion that the damage awards were excessive because the First Amended Complaint only sought $10,000 in damages. This contention is based on a mischaracterization of the record. The prayer for relief in the First Amended Complaint was for "a sum of

money as actual damages for lost wages, pain, suffering, humiliation, embarrassment and deprivation of [his] civil rights, plus pre-judgment interest." There was no request for a specific amount of damages.

In the argument section under this point, respondent makes a different argument; that complainant is bound by the amounts of damages that the assistant attorney general (A.A.G.) requested at the hearing. This argument is not preserved for a number of reasons. First, arguments not contained in the point relied on and raised for the first time in the argument section of a brief are not reviewable. *Brizendine v. Conrad,* 71 S.W.3d 587, 593 (Mo. banc 2002). Second, respondent cites no legal authority to support its contention that the Commission's statutory authority to award damages is limited by the A.A.G.'s request at a hearing. An "appellant must cite legal authority to support his points relied on if the point is one in which precedent is appropriate or available; if no authority is available, an explanation should be made for the absence of citations." *In re Marriage of Fritz,* 243 S.W.3d 484, 488 (Mo.App.2007). "Failure to cite relevant authority supporting the point or to explain the failure to do so preserves nothing for review." *Id.* Third, although the Commission addressed this issue and concluded that complainant was not limited to the amount of damages suggested by the A.A.G. at the hearing, in his Petition for Review, complainant did not challenge the amounts of damages on the ground that they were restricted by the amounts suggested by the A.A.G. An issue raised on appeal that was not contained in the Petition for Review is not preserved. *Artman v. State Bd. of Registration,* 918 S.W.2d 247, 252 (Mo. banc 1996); *Chipperfield v. Mo. Air Conservation Com'n,* 229 S.W.3d 226, 234 (Mo.App.2007). For all of

these reasons, this argument is not preserved.

B. *Whether Damage Amounts are Arbitrary, Capricious, or Unreasonable*

We next consider respondent's contention that the amounts of damages awarded are arbitrary, capricious, or unreasonable because they are "grossly disproportionate" from what the Commission awarded in other cases and complainant's own testimony supported a finding that the damages were excessive.

The MHRA authorizes the Commission to award actual damages to discrimination victims. Section 213.075.11. Actual damages include damages for emotional distress, humiliation, and deprivation of civil rights. *Biggs v. Missouri Com'n on Human Rights,* 830 S.W.2d 512, 516 (Mo.App.1992); *see Conway v. Missouri Com'n on Human Rights,* 7 S.W.3d 571, 575 (Mo.App.1999). Damages for emotional distress and humiliation in civil rights cases may be " 'established by testimony or inferred from the circumstances.' " *Red Dragon,* 991 S.W.2d at 171 (quoting *Johnson v. Hale,* 940 F.2d 1192, 1193 (9th Cir. 1991)); *State ex rel Dean v. Cunningham,* 182 S.W.3d 561, 567 (Mo. banc 2006). "A damage award is designed to fulfill the remedial purposes of the civil rights laws and compensate a wronged person for the loss or injury suffered." *Van Den Berk v. Com'n on Human Rights,* 26 S.W.3d 406, 413 (Mo.App.2000).

"The severity of the harm suffered by the plaintiff due to the deprivation of his or her civil rights ... should be used to determine the amount of the damages." *Red Dragon,* 991 S.W.2d at 171. "Intangible damages, such as pain, suffering, embarrassment, emotional distress, and humiliation do not lend themselves to precise calculation." *Van Den Berk,* 26 S.W.3d at 413. "Each case requires indi-

vidualized contemplation and consideration by the trier of fact." *Id.* at 414.

The Commission awarded complainant $50,000 for humiliation and emotional distress. The Commission explained its award as follows:

It is clear that the discriminatory conduct caused great emotional distress to Sir. This discrimination motivated by disability made Sir feel like a "slave," a "servant," or a "homeless person." Sir's feelings in this regard are the essence of a humiliating experience and are ample evidence of deep emotional distress.

An award of damages for humiliation and emotional distress is well justified in this case. The behavior of the Laclede Cab president was extreme, including the abrupt dismissal of an individual based on Laclede's president's perception of Sir's physical condition. The president's perception was colored by his wife's experience as a stroke victim, based only on a few minutes' observation of Sir's physical state, and without consideration of Sir's qualifications.

Sir was subjected to outright discrimination based on his disability resulting from a stroke and he was asked about it by Laclede's then president just moments before Sir was asked to leave. The nature of the discriminatory conduct shows that damages for emotional distress are well justified. The conduct caused Sir lasting emotional pain. He had trouble physically, psychologically, and in his marriage.

The Commission also awarded complainant $35,000 for deprivation of his civil rights. It observed that in *Conway*, the Commission had awarded the complainant one-third of the amount of its award for emotional distress and humiliation for violation of her civil rights. However, the Commission rejected the concept of using the one-third calculation as a formula because respondent had a previous violation of the MHRA and because of the clear nature of the violations.

### a. *Disproportionate Award*

██ In arguing the award was disproportionate, respondent first refers to *Conway*, in which the Commission had awarded $3,000 in emotional distress damages and $1,000 in civil rights damages. Although the civil rights damages were one-third of the emotional distress damages in *Conway*, *Conway* did not purport to establish this ratio as a formula for computing damage amounts. The Commission was not under any obligation to limit its award of civil rights damages to one-third of its award for emotional distress and humiliation.

Respondent also argues that the amounts awarded were disproportionate because the Commission had awarded substantially less damages in *Conway* and certain other cases, all of them from thirteen to thirty-one years old. However, respondent cites no authority to support its assumption that the Commission must award damages in different cases in consistent amounts. To the contrary, as we held in *Van Den Berk*, the trier of fact must give each case individualized consideration when determining these types of intangible damages. 26 S.W.3d at 414.

██ Respondent also argues that complainant's own testimony showed that the impact on his emotional well-being did not warrant the amount of damages awarded. He refers to complainant's testimony, "I've been angry, but not too much," and the lack of medical evidence.

██ Complainant's testimony about how respondent's conduct humiliated him and adversely affected his physical and emotional health, marriage, and self-esteem was sufficient to support the awards

of damages for humiliation and emotional distress and for deprivation of civil rights. In discrimination cases, we do not limit recovery of damages for emotional distress to those situations in which the distress is medically diagnosable or of sufficient severity to be medically significant. *See Conway*, 7 S.W.3d at 575; *Red Dragon*, 991 S.W.2d at 170–71. Complainant was not required to submit medical evidence to prove this sort of emotional distress. *Dean*, 182 S.W.3d at 568.

Respondent has not shown that the Commission's awards of damages were arbitrary, capricious or unreasonable. Point three is denied.

## COMPLAINANT'S CROSS–APPEAL

### I. *Back Pay*

██ For his first point, complainant contends that the Commission erred in determining that it could not award him back pay, and its decision was arbitrary, capricious, or unreasonable because the MHRA authorizes back pay in failure-to-hire cases. In this case, there was no error because the state specifically withdrew the request for back pay.

The First Amended Complaint alleged that complainant had suffered loss of income and requested an award of damages for lost wages. However, at the hearing, the hearing examiner referred to the requests for relief in the First Amended Complaint and asked the A.A.G. if she was limiting the request for relief. The A.A.G. replied that she was limiting the requests "to pain and suffering, emotional distress, humiliation, embarrassment and deprivation of civil rights." The A.A.G. specified that she was not seeking "loss of income." The A.A.G. and respondent's attorney stipulated that the First Amended Complaint would be amended by interlineation, and paragraph 31(a), which alleged that com-

plainant had suffered loss of income, was to be removed from the First Amended Complaint. The hearing examiner confirmed with the A.A.G. and directly with complainant that complainant understood that the A.G.'s office was not seeking loss of income as damages for complainant.

██ "As a general rule, we will not set aside an administrative action unless the agency has been given a prior opportunity to consider the claimed error." *Wells v. Director of Public Safety*, 295 S.W.3d 597, 600 (Mo.App.2009). "We cannot convict [an administrative tribunal] of erroneously deciding an issue never presented to it." *Id.* Here, we cannot convict the Commission of erroneously failing to award relief when it was not requested to do so.

The Commission did not err in not awarding back pay because the state withdrew its request for an award of back pay. Complainant's first point is denied.

### II. *Punitive Damages*

██ For his second point, complainant asserts that the Commission's decision denying an award of punitive damages was arbitrary, capricious, or unreasonable because he requested punitive damages, the MHRA authorizes punitive damages, and respondent's conduct merited an award of punitive damages. We disagree.

Complainant erroneously relies on section 213.111.2 as authorizing the recovery of punitive damages. This section allows a *court* to award punitive damages in a *civil action*. It does not address damages that may be awarded in an administrative proceeding before the Commission.

██ The Commission can award only those damages "authorized by statute because 'administrative agencies have only those powers expressly conferred or reasonably implied by statute.'" *Red Dragon*, 991 S.W.2d at 171 (quoting *State ex rel.*

*Riverside Joint Venture v. Missouri Gaming Com'n,* 969 S.W.2d 218, 220 (Mo. banc 1998)). Section 213.075.11(1) authorizes the Commission to enter a cease and desist order which shall require a respondent

> to take such affirmative action, as in the panel's judgment will implement the purpose of this chapter, including, but not limited to backpay; hiring; reinstatement or upgrading; restoration to membership in any respondent labor organization; the extension of full, equal and unsegregated housing; the extension of full, equal and unsegregated public accommodations; actual damages; and the submission of a report of the manner of compliance.

Except for actual damages, all of this relief is equitable in nature. *State ex rel. Tolbert v. Sweeney,* 828 S.W.2d 929, 934 (Mo. App.1992), *overruled on other grounds by State ex rel. Diehl v. O'Malley,* 95 S.W.3d 82 (Mo. banc 2003). The statute does not specifically authorize punitive damages, and punitive damages are not reasonably encompassed by any of the categories of equitable relief or actual damages authorized by the statute. Complainant has not cited any Missouri case that has held that section 213.075.11(1) authorizes an award of punitive damages.[3]

The Commission did not err in not awarding punitive damages. Point two is denied.

### III. *Prejudgment Interest*

For his third point, complainant asserts: THE CIRCUIT COURT ERRED IN AWARDING MR. SIR PREJUDGMENT INTEREST UNDER R.S.MO. § 408.040.3 FROM APRIL 26, 2011 THROUGH THE PRESENT BECAUSE ITS DECISION WAS ARBITRARY, CAPRICIOUS AND/OR UNREASONABLE IN THAT ON AND AFTER THE COMMISSION'S DECISION AND ORDER OF APRIL 26, 2011 POST JUDGMENT INTEREST APPLIES AT THE NINE PERCENT PER YEAR RATE SET FORTH IN R.S.MO. § 408.040.1.

This point is not only indecipherable, but it also fails to identify an error of the Commission for our review. *See* Rule 84.04(d)(2); *Weisenburger v. City of St. Joseph,* 51 S.W.3d 119, 123 (Mo.App.2001). Accordingly, we decline to review this point.

### Conclusion

The judgment of the circuit court on judicial review is affirmed. Complainant's motion for attorney's fees on appeal is denied.

MARY K. HOFF, J. and LISA VAN AMBURG, J., concur.

---

**3.** The Commission cited *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d 1051, 1062 (8th Cir. 1993), as holding that punitive damages may be awarded. *Kientzy* is inapposite. It involved a *jury* award of punitive damages. It did not address whether punitive damages could be awarded in an administrative proceeding under 213.075.11(1).